[This opinion has been published in *Ohio Official Reports* at 86 Ohio St.3d 560.]

THE STATE OF OHIO, APPELLEE, *v.* CORNWELL, APPELLANT.

[Cite as *State v. Cornwell*, 1999-Ohio-125.]

*Criminal law—Aggravated murder—Death penalty upheld, when.*

(No. 97-1390—Submitted June 8, 1999—Decided September 22, 1999.)

APPEAL from the Court of Common Pleas of Mahoning County, No. 96-CR-525.

————————————

{¶ 1} During the early morning hours of June 11, 1996, defendant-appellant, Sidney Cornwell, and some associates who belonged to a neighborhood gang in Youngstown drove up to an apartment building on Oak Park Lane with the intention of shooting a rival gang member. When the intended victim was not seen, Cornwell opened fire on the occupants of an apartment, killing a three-year-old child and wounding three adults. Cornwell was subsequently convicted of aggravated murder and attempted aggravated murder, and sentenced to death.

{¶ 2} On the afternoon of the previous day, Cornwell and other members or associates of the "Crips" gang had been involved in a shootout with members of the "Bloods" gang on Elm Street at New York Avenue in Youngstown. One of the associates of the Crips, Edward McGaha, was grazed on the head by a bullet during the gunfire exchange. McGaha saw Richard "Boom" Miles, a member of the Bloods, and Michael Williams leave the scene, but did not see either of them shooting. During the shootout, McGaha saw Cornwell using a black gun. Police later recovered six 9-mm Luger shell casings from the shooting scene at the corner of New York Avenue and Elm Street.

{¶ 3} Later that afternoon, McGaha was released from the hospital and went to his mother's home on Elm Street. While he was standing outside in front of the house with several people, including Cornwell, a carload of Bloods jumped out and

opened fire on them. According to McGaha, Cornwell returned gunfire with the same black semiautomatic weapon he had used at the earlier shootout.

{¶ 4} Shortly thereafter, McGaha, Cornwell, and others gathered at a New York Avenue house where a man named "Heavy" lived. Also present at Heavy's house were Gary Drayton, Leslie Johnson, Edward Bunkley, and Denicholas Stoutmire. The talk among the group centered on retaliation for the earlier shooting of McGaha. The plan of action was to kill Boom Miles. Although McGaha later admitted on cross-examination that he knew that Boom was not the person who had shot him, he went along with the plan to seek out and kill Boom.

{¶ 5} That night, Bunkley and Stoutmire stole two vehicles, a Buick and a Pontiac Bonneville, in order to facilitate the group's search for Boom. During this time, the rest of the group remained at Heavy's place, drinking and smoking marijuana. When Bunkley and Stoutmire returned to Heavy's with the stolen cars, the group (minus Heavy) went out to search for Boom around Youngstown. By this time Antwan Jones and Damian Williams had joined the group. The group used a third car, a Chevette belonging to a friend.

{¶ 6} Stoutmire drove the stolen blue Bonneville while Williams rode with him in the front passenger seat. Johnson sat in the back seat behind Williams, and Cornwell sat in the driver side back seat behind Stoutmire. According to one witness, the only people carrying weapons in the Bonneville were Williams, who had a .45 automatic pistol, and Cornwell, who had a semiautomatic 9-mm black gun. However, Bunkley testified that the other two passengers in the Bonneville also had weapons. Nevertheless, Bunkley did corroborate several witnesses' testimony that Cornwell was carrying a 9-mm weapon.

{¶ 7} After driving around Youngstown for about an hour, the three cars proceeded to Oak Park Lane because Stoutmire thought Boom might be there. Susan Hamlett lived in Apartment No. 5 in the apartment building at 4 Oak Park Lane in Youngstown. Hamlett's friend, Marilyn Conrad, and Conrad's son also

lived with Hamlett, along with Hamlett's nephew and two nieces, one of whom was three-year-old Jessica Ballew. Hamlett was familiar with Boom and knew that he frequented the Oak Park area. Earlier that evening, Boom had played with the children who lived in Hamlett's apartment, but Hamlett did not see him after that.

{¶ 8} At approximately 2:00 a.m. on June 11, 1996, Hamlett was outside on her porch talking to a friend, Donald Meadows. Jessica Ballew came to the doorway on the porch to get a drink of water. At that time, three cars drove up Oak Park Lane. The first two cars went past the apartment, but the light blue Bonneville stopped in front of the apartment, and a voice came from the car asking for Boom. According to Damian Williams, who was seated in the Bonneville with Cornwell, the voice from the car was Cornwell's. Both Hamlett and Meadows responded that Boom was not there. Cornwell asked again where Boom was, and Hamlett said that he did not live there. Cornwell then replied: "Well, tell Boom this." A volley of shots (more than five, less than ten) was fired at the apartment. Jessica Ballew sustained two gunshot wounds, including a fatal one to her head. Meadows was wounded, as were Conrad and a visiting friend who was inside. The three vehicles fled the scene, and Damian Williams was dropped off because he "didn't want anything to do with a baby getting killed."

{¶ 9} Youngstown police officer Joseph Wess soon received a call regarding the shooting at Oak Park Lane. He then noticed three cars, two of them fitting the descriptions he had just received. He pursued the vehicles and saw the Bonneville parked in the driveway of a vacant house. With his car lights off, Wess pulled up behind the Bonneville. Then Wess turned on his headlights, and all of the occupants jumped out of the Bonneville and ran away. Wess pursued one suspect, who he said jumped out of the driver's door, catching him after a brief foot chase. That suspect turned out to be Sidney Cornwell, who was immediately arrested. Upon conducting a search of the Bonneville, Wess found, among other items, a spent 9-mm shell casing. However, no gun was found in the Bonneville.

**{¶ 10}** On July 26, 1996, a grand jury indicted Cornwell for aggravated murder (prior calculation and design) and three counts of attempted aggravated murder. Each count also carried a firearm specification. In addition, a death-penalty specification alleged that Cornwell had committed aggravated murder as part of a course of conduct involving the purposeful killing of, or attempt to kill, two or more persons (R.C. 2929.04[A][5]).

**{¶ 11}** At trial before a jury, Donald Meadows, one of the victims of the Oak Park Lane shooting, identified Cornwell as the man who had shot him. Damian Williams, one of Cornwell's accomplices in the blue Bonneville on the morning of June 11, also identified Cornwell as the sole gunman in the fatal shooting at Oak Park Lane.

**{¶ 12}** Officer Robert Mauldin testified that he and other officers recovered several 9-mm shell casings from the area of Elm Street and New York Avenue on June 10, 1996, and from the area of Oak Park Lane, Apartment No. 5, on the early morning of June 11. Although Mauldin stated that .380 shell casings were also found at the scene of the Elm Street and New York Avenue shooting, only 9-mm shell casings were recovered from the Oak Park area. Mauldin also identified two 9-mm shell casings that were recovered from the Bonneville that was at the Oak Park shooting.

**{¶ 13}** Michael Roberts, a forensic scientist with the Ohio Bureau of Criminal Identification and Investigation, testified that, to a reasonable degree of scientific certainty, all ten 9-mm Luger shell casings recovered from both the Elm Street and Oak Park Lane shootings came from the same handgun. The murder weapon was never recovered. After deliberation, the jury found Cornwell guilty as charged.

**{¶ 14}** At the mitigation hearing, nine witnesses testified on Cornwell's behalf, including his mother, three siblings, and other relatives. Psychologist James Eisenberg concluded that Cornwell had grown up in a violent and chaotic family,

which caused him serious problems of identity and dependency.

{¶ 15} The jury recommended death, and the trial court imposed the death sentence on Cornwell. The court then sentenced Cornwell to prison on his other convictions.

{¶ 16} The cause is now before this court upon a direct appeal as of right.

_____

*Paul J. Gains,* Mahoning County Prosecuting Attorney, and *Janice T. O'Halloran,* Assistant Prosecuting Attorney, for appellee.

*John B. Juhasz* and *Mary Jane Stephens,* for appellant.

_____

**PFEIFER, J.**

{¶ 17} Appellant has raised nine propositions of law. We have reviewed each and have determined that none justifies reversal of appellant's convictions for aggravated murder and the other crimes he committed. Pursuant to R.C. 2929.05(A), we have also independently weighed the aggravating circumstance against the evidence presented in mitigation and reviewed the death penalty for appropriateness and proportionality. For the reasons that follow, we affirm appellant's convictions and death sentence.

VOIR DIRE/PRETRIAL ISSUES

*Failure to Excuse Biased Jurors*

{¶ 18} In his first proposition of law, Cornwell contends that the trial court erred in failing to excuse for cause six prospective jurors who expressed views in favor of the death penalty. Cornwell asserts that he was forced to exercise peremptory challenges on five of these biased jurors, but that one juror who should have been excused, Angela Reichenbach, sat on the jury that recommended that he receive the death penalty.

{¶ 19} Trial courts have discretion in determining a juror's ability to be impartial. *State v. Williams* (1983), 6 Ohio St.3d 281, 288, 6 OBR 345, 351, 452

N.E.2d 1323, 1331. R.C. 2313.42(J) states that good cause exists for the removal of a prospective juror when "he discloses by his answers that he cannot be a fair and impartial juror or will not follow the law as given to him by the court." A prospective juror who has been challenged for cause should be excused "if the court has any doubt as to the juror's being entirely unbiased." R.C. 2313.43. See *State v. Allard* (1996), 75 Ohio St.3d 482, 495, 663 N.E.2d 1277, 1289. However, a ruling "will not be disturbed on appeal unless it is manifestly arbitrary * * * so as to constitute an abuse of discretion." *State v. Tyler* (1990), 50 Ohio St.3d 24, 31, 553 N.E.2d 576, 587. Accord *State v. Williams* (1997), 79 Ohio St.3d 1, 8, 679 N.E.2d 646, 654.

{¶ 20} While a review of the voir dire examination cited by Cornwell indicates that all six jurors favored capital punishment, all of them stated that they would consider a lesser sentence and would follow the law as instructed by the trial judge.

{¶ 21} Cornwell asserts that he was prejudiced by a less-than-impartial jury because he had exhausted his peremptory challenges and juror Angela Reichenbach sat on the jury. During voir dire, Reichenbach stated her belief that the death penalty serves as a deterrent and should be imposed if the crime was severe, intentional, malicious, or brutal. Yet Reichenbach also agreed that she could follow the law as instructed by the trial judge even if she disagreed with it. Moreover, she expressed the view that the death penalty should not be imposed "in every case where someone dies," and that there are mitigating circumstances in determining who should get the death penalty in any murder case.

{¶ 22} Here, the trial court considered the defense's challenge for cause on Reichenbach, but determined that her views were not biased in favor of death, since she believed that the death penalty should apply only in certain cases if the facts would warrant it. Under these circumstances, no abuse of discretion on the part of the trial court is apparent. "[D]eference must be paid to the trial judge who sees

and hears the juror." *Wainwright v. Witt* (1985), 469 U.S. 412, 426, 105 S.Ct. 844, 853, 83 L.Ed.2d 841, 853.

{¶ 23} The other five prospective jurors who Cornwell contends should have been excused for cause were peremptorily challenged by the defense and thus never sat on Cornwell's jury. In *Ross v. Oklahoma* (1988), 487 U.S. 81, 86, 108 S.Ct. 2273, 2277, 101 L.Ed.2d 80, 88, the United States Supreme Court stated that any claim asserting that a jury was not impartial must focus on the jurors who ultimately sat. In addition, the United States Supreme Court rejected the notion that the loss of a peremptory challenge constitutes a violation of the constitutional right to an impartial jury. *Id.* at 88, 108 S.Ct. at 2278, 101 L.Ed.2d at 90. In contrast, however, this court has recognized that where the defense exhausts its peremptory challenges before the full jury is seated, the erroneous denial of a challenge for cause in a criminal case may be prejudicial. *Hartnett v. State* (1885), 42 Ohio St. 568, paragraph four of the syllabus; *Tyler, supra*, 50 Ohio St.3d at 30-31, 553 N.E.2d at 586-587; *Williams, supra*, 79 Ohio St.3d at 8, 679 N.E.2d at 655.

{¶ 24} Nevertheless, none of the five peremptorily challenged jurors in issue merited an excusal for cause by the trial court, since all appeared to be impartial with regard to whether the death penalty should be imposed. Prospective juror Sharlene Bica stated that she could follow the law even if she disagreed with it, and could vote for a life sentence. Although Bica supported the death penalty, she stated that she would give meaningful consideration to life-sentencing options and would follow the court's instructions.

{¶ 25} Prospective juror James Studacher stated in his questionnaire that he believed in the death penalty as "a life for a life" and had "trouble" with murderers getting life sentences. Yet Studacher stated that he would consider life imprisonment options and agreed that he would follow the law even if it conflicted with his personal beliefs. He also agreed that the death penalty was not automatic and that a life sentence was a severe penalty.

**{¶ 26}** Prospective juror Suzanne Murphy favored the death penalty but agreed that she could return a verdict recommending a life sentence. In addition to affirming that she would give life-sentencing options meaningful consideration, Murphy declared that she would need to see the facts of the case to determine whether death or a life sentence would be the more appropriate sentence.

**{¶ 27}** Prospective juror Judith Keefer stated that she believed "the death penalty is Biblical." Nevertheless, Keefer stated that she would follow the judge's instructions and consider the mitigating circumstances, regardless of her personal beliefs. The trial court's decision to reject the defense challenge for cause on Keefer was not an abuse of discretion, especially in view of the deference that must be paid to the trial judge who sees and hears the juror. *State v. Wilson* (1972), 29 Ohio St.2d 203, 211, 58 O.O.2d 409, 414, 280 N.E.2d 915, 920.

**{¶ 28}** Prospective juror Sally Smolek also favored the death penalty but indicated that she would set aside her personal believes and follow the law, and that she could recommend a life sentence.

**{¶ 29}** Based on the foregoing, we reject Cornwell's first proposition of law.

*Duration of Voir Dire Interrogation*

**{¶ 30}** In Proposition of Law II, Cornwell argues that the parties were not given the "wide latitude in voir dire questioning" required by R.C. 2945.25(C). Cornwell asserts that the court set an arbitrary time limit on voir dire that disrupted the jury selection process and undermined constitutional safeguards. Cornwell points out that the court twice informed defense counsel of the time they had left in questioning juror Reichenbach and that the trial court erred by unreasonably failing to grant the defense sufficient time to question Reichenbach concerning her death-penalty views.

**{¶ 31}** "The scope of voir dire is within the trial court's discretion and varies depending on the circumstances of each case." *State v. Bedford* (1988), 39 Ohio

St.3d 122, 129, 529 N.E.2d 913, 920. No prejudicial error can be assigned to the examination of veniremen in qualifying them as fair and impartial jurors unless a clear abuse of discretion is shown. *State v. Ellis* (1918), 98 Ohio St. 21, 120 N.E. 218, paragraph one of the syllabus; *State v. Beuke* (1988), 38 Ohio St.3d 29, 39, 526 N.E.2d 274, 285. "[T]he trial court reserves the right and responsibility to control the proceedings of a criminal trial pursuant to R.C. 2945.03, and must limit the trial to relevant and material matters with a view toward the expeditious and effective ascertainment of the truth." *State v. Durr* (1991), 58 Ohio St.3d 86, 89, 568 N.E.2d 674, 678, citing *State v. Bridgeman* (1977), 51 Ohio App.2d 105, 109-110, 5 O.O.3d 275, 277, 366 N.E.2d 1378, 1383.

{¶ 32} The trial judge allotted each side one-half hour to question each prospective juror. Defense counsel did not object to the court's time allotment. Nor did counsel request more time to question juror Reichenbach during voir dire. In fact, at the close of Reichenbach's voir dire, defense counsel stated, "We have no further questions at this time."

{¶ 33} Cornwell cites several instances where he claims the trial court unreasonably restricted defense counsel's voir dire of Reichenbach. Yet Cornwell's claims in this regard do not withstand scrutiny. The court's statement to defense counsel that he had fourteen minutes left in questioning Reichenbach was in response to defense counsel's inquiry: "May I inquire of the time, Your Honor?" In addition, Cornwell misrepresents the trial court's actions during Reichenbach's voir dire when the court stated, "[W]e're getting pretty far afield here * * *, and let's move on." The court did not sustain the prosecutor's objection as Cornwell states in his brief; it overruled it and permitted the particular question objected to. The trial court's later reminder to defense counsel that it had four minutes left in questioning Reichenbach does not appear to be the abrupt, unreasonable interruption that Cornwell implies. Rather, it appears to be more in the nature of a courtesy reminder, made at the time the court sustained an objection

by the prosecutor.

{¶ 34} Since no abuse of discretion is apparent, we reject Proposition of Law II.

TRIAL ISSUES

*Jury Instructions*

{¶ 35} In Proposition of Law III, Cornwell asserts that the trial court denied him due process in instructing the jury on complicity, since it was never pleaded or argued that Cornwell was anything but the shooter. Cornwell contends that the complicity instruction essentially invited the jury to find him guilty of something, and that it ensured a conviction, since it gave the jurors more theories and verdict forms on which to find Cornwell guilty of something.

{¶ 36} Cornwell failed to object to the complicity instruction and thus has waived all but plain error. *State v. Underwood* (1983), 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus. Plain error is not present here. Cornwell is correct in pointing out that none of the evidence and arguments proffered by the state implicated him otherwise than as the sole gunman. Yet some testimony regarding the gunman's identity could be construed as conflicting. Officer Wess identified Cornwell as the driver of the Bonneville, whom he chased shortly after the shooting, whereas Cornwell's accomplices generally testified that Cornwell was a back-seat passenger. Also, Meadows at one point testified that he did not remember whether the gunman drove the Bonneville or was in the back seat.

{¶ 37} Given the fact that some crucial testimony came from Cornwell's accomplices, a reasonable jury could have concluded that the accomplices' testimony was less than reliable or was designed to pin the shooting on Cornwell as a scapegoat. The evidence clearly showed that Cornwell was present at the shooting. Yet the complicity instruction gave the jury the opportunity to convict Cornwell as an accomplice, if, for instance, the jury had a reasonable doubt as to whether he was the actual shooter.

**{¶ 38}** Regardless of whether a complicity instruction was requested, a trial court "must give all instructions that are relevant and necessary for the jury to weigh the evidence and discharge its duty as the factfinder." *State v. Joy* (1995), 74 Ohio St.3d 178, 181, 657 N.E.2d 503, 505, citing *State v. Comen* (1990), 50 Ohio St.3d 206, 553 N.E.2d 640, paragraph two of the syllabus. Moreover, as we noted in *State v. Keenan* (1998), 81 Ohio St.3d 133, 151, 689 N.E.2d 929, 946, under R.C. 2923.03(F), defendants are "on notice that the jury may be given a complicity instruction even though the defendant has been charged as a principal offender." Proposition of Law III is rejected.

## SENTENCING ISSUES

### *Sentence Appropriateness*

**{¶ 39}** In Proposition of Law VIII, Cornwell argues that there is a reasonable doubt as to whether the aggravating circumstance outweighs the aggregate mitigating evidence. Whether Cornwell's death sentence was appropriate will be discussed in our independent sentence evaluation.

**{¶ 40}** Cornwell also contends that the prosecutor's statement requesting that all relevant guilt-phase evidence be admitted during the sentencing phase indicated that he was relying on the offense itself as an aggravating circumstance. Cornwell's assertion is incorrect.

**{¶ 41}** The prosecutor stated: "Your Honor, the people of the State move to introduce any and all evidence that was introduced at trial that is relevant to the aggravating circumstance that the defendant was guilty of committing; namely, that the aggravated murder was part of a course of conduct involving the purposeful killing or attempt to kill two or more persons."

**{¶ 42}** Pursuant to R.C. 2929.03(D)(1), the prosecutor may introduce "any evidence raised at trial that is relevant to the aggravating circumstances the offender was found guilty of committing." It is the trial court's responsibility, not the jury's, to determine what evidence is relevant. *State v. Getsy* (1998), 84 Ohio St.3d 180,

201, 702 N.E.2d 866, 887.  To characterize the prosecutor's statement as evidence that he relied on the offense itself as an additional aggravating circumstance is unpersuasive.  Cornwell argues that the jury "relied on the underlying offense with all of its emotional baggage" to recommend death, simply because the prosecutor did not make a full-blown presentation of the trial evidence.  Yet, as the prosecutor noted during his opening statement: "We don't put it [trial evidence] all back on again because it would be repetitive  * * *."  Proposition of Law VIII is rejected.

EFFECTIVE ASSISTANCE

{¶ 43} In Proposition of Law IV, Cornwell contends that he was denied the effective assistance of counsel before trial, during voir dire, and when counsel failed to object to the instruction on complicity.  In Proposition of Law IX, Cornwell asserts that he was denied effective assistance because counsel failed to request definite terms of sentence on his three attempted aggravated murder convictions.

{¶ 44} A claim of ineffective assistance "has two components.  First, the defendant must show that counsel's performance was deficient.  * * * Second, the defendant must show that the deficient performance prejudiced the defense[,] depriv[ing] the defendant of a fair trial  * * *."  *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693.  Accord *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373.  However, in no instance does Cornwell demonstrate prejudice, "a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different."  *Id.* at paragraph three of the syllabus.

{¶ 45} Cornwell first complains that defense counsel never asked five jurors during voir dire whether they had a preference for the death penalty.  Yet this court has stated that "[t]he conduct of voir dire by defense counsel does not have to take a particular form, nor do specific questions have to be asked."  *State v. Evans* (1992), 63 Ohio St.3d 231, 247, 586 N.E.2d 1042, 1056.  Examination of the entire

voir dire testimony of the five jurors in question indicates no deficient performance or errors on the part of defense counsel.

{¶ 46} Juror Linda Angelot stated that she really did not have "one opinion or another about the death penalty." She indicated that she would follow the law and the judge's instructions even if she disagreed with them.

{¶ 47} Juror Matchette told the court "I don't know" when asked whether she could sign a death verdict. She also stated that she would follow the law and the court's instructions on whether to return a verdict for a life sentence or the death penalty. She indicated that she would put any personal feelings aside and follow the law as given by the trial judge in determining a sentencing verdict.

{¶ 48} Juror Heather Blake indicated to the court that she could join in a verdict for either a life sentence or a death sentence. She also stated that she would follow the law as given by the trial court in rendering a sentencing verdict.

{¶ 49} Juror Gertrude Garchar agreed that she could return a verdict for either a death sentence or a life sentence. She told defense counsel she had no opinion on the death penalty one way or the other but would follow the court's instructions. She agreed with defense counsel that death may not be the appropriate penalty under certain circumstances.

{¶ 50} Juror Richard Crnarich indicated that he could sign a verdict for either a life sentence or a death sentence and that he really did not have an opinion on the death penalty. He agreed that he would follow the trial judge's instructions as to the law.

{¶ 51} As we noted in *State v. Watson* (1991), 61 Ohio St.3d 1, 13, 572 N.E.2d 97, 108, defense counsel "need not repeat questions about topics already covered by group voir dire, opposing counsel, or the judge." Moreover, we will not second-guess trial strategy decisions such as those made in voir dire. *State v. Mason* (1998), 82 Ohio St.3d 144, 157, 694 N.E.2d 932, 949. In view of the applicable law and the testimony elicited during voir dire from the jurors in

question, we believe that defense counsel was neither remiss nor ineffective in failing to ask a question that was, in essence, already posed to each juror during voir dire by the court.

{¶ 52} Cornwell next claims ineffective assistance in that defense counsel failed to object to the complicity instruction proposed by the trial judge. However, as pointed out earlier, the instruction was not objectionable. Moreover, counsel's decision not to object to the instruction could be rightly characterized as a trial strategy. Such tactics or strategies are viewed with the presumption that effective legal counsel was rendered. See *Bradley,* 42 Ohio St.3d at 144, 538 N.E.2d at 381-382.

{¶ 53} Cornwell next contends that counsel were ineffective in failing to file pretrial motions challenging the death-penalty law and the constitutionality of the death specification. We have previously rejected the same arguments. In *State v. Davis* (1991), 62 Ohio St.3d 326, 349, 581 N.E.2d 1362, 1381, we found that a failure to file a pretrial motion challenging the constitutionality of Ohio's death-penalty statute "was not critical," and therefore not ineffective assistance, because the statute has been found to be constitutional. Similarly, counsel's failure to file a pretrial motion challenging the constitutionality of the R.C. 2929.04(A)(5) course-of-conduct specification was also not critical. The course-of-conduct specification has withstood different constitutional challenges. See *State v. Benner* (1988), 40 Ohio St.3d 301, 533 N.E.2d 701, syllabus ("R.C. 2929.04[A][5] is not void for vagueness"). Accord *State v. Brooks* (1996), 75 Ohio St.3d 148, 155, 661 N.E.2d 1030, 1037.

{¶ 54} Cornwell also alleges that counsel failed to obtain data on the death penalty in order to make a record or argue proportionality to the jury. Counsel's failure to obtain data on the death penalty with regard to proportionality analysis was not ineffective. A jury or trial court does not engage in proportionality analysis. See, generally, *State v. Roe* (1989), 41 Ohio St.3d 18, 25, 535 N.E.2d

1351, 1361. That analysis is conducted by this court alone. R.C. 2929.05.

{¶ 55} Cornwell's claim of ineffective assistance under Proposition of Law IX is also without merit. Cornwell argues that defense counsel were ineffective for failing to request that he be sentenced pursuant to 1995 Am.Sub.S.B. No. 2 to definite terms of imprisonment for his three attempted aggravated murder convictions. Cornwell claims that R.C. 1.58 gives him the benefit of any decrease in penalty as of the date of sentencing, even though Am.Sub.S.B. No. 2 purports to apply only to those felonies committed on or after July 1, 1996.

{¶ 56} This court recently resolved precisely this issue in *State v. Rush* (1998), 83 Ohio St.3d 53, 697 N.E.2d 634, paragraph two of the syllabus: "Because the General Assembly has expressly stated that the amended sentencing provisions of Am.Sub.S.B. No. 2 are applicable only to those crimes committed on or after its effective date, R.C. 1.58(B) is inapplicable. The amended sentencing provisions of Am.Sub.S.B. No. 2 apply only to those crimes committed on or after July 1, 1996."

{¶ 57} Since Cornwell's crimes were committed prior to July 1, 1996, he was not eligible for any definite terms of imprisonment provided by Am.Sub.S.B. No. 2. *Id.* Thus, counsel were not ineffective for failing to request something that Cornwell was ineligible to receive. Accordingly, we reject Propositions of Law IV and IX.

PROSECUTORIAL MISCONDUCT

**{¶ 58}** In Proposition of Law VII, Cornwell asserts that the prosecutor vouched for the credibility of three state's witnesses: McGaha, Jones, and Williams. Cornwell points out that the prosecutor asked leading questions of McGaha and Jones, and bolstered the testimony of all three by asking them questions about their plea-bargain agreements with the state. As to each witness, the prosecutor asked whether the plea agreement was made in exchange for "your truthful testimony" or "truthful sworn statement." The defense never objected when McGaha was asked the question. However, Cornwell's objections to the questions posed to Jones and Williams were overruled. The issue with respect to McGaha is waived except for plain error that would affect the outcome of the trial. *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus.

**{¶ 59}** The test for prosecutorial misconduct is whether remarks were improper and, if so, whether they prejudicially affected substantial rights of the accused. *State v. Smith* (1984), 14 Ohio St.3d 13, 14-15, 14 OBR 317, 318-319, 470 N.E.2d 883, 885. The touchstone of analysis "is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips* (1982), 455 U.S. 209, 219, 102 S.Ct. 940, 947, 71 L.Ed.2d 78, 87.

**{¶ 60}** Even assuming that the prosecutor's questions constituted error, they did not affect Cornwell's substantive rights. Cornwell submits that the testimony of these witnesses linked him to the crimes and that since no physical evidence linked him to the crimes, the cumulative effect of the prosecutorial questions was overwhelming. However, the jury might well have believed all three witnesses' testimony even if the prosecutor had not asked questions concerning the plea agreement made in exchange for "truthful testimony." Moreover, Donald Meadows, one of the victims and someone who did not testify as part of a plea agreement, identified Cornwell as the gunman.

**{¶ 61}** Arguably, all three witnesses might have seemed even more credible

had the jury not been told of the plea-bargain agreements. Several courts have noted that a "truthful testimony" clause in the plea agreement can be a two-edged sword. Defense counsel can effectively argue to the jury that such a clause gives the witness incentive not to tell the truth but to please the prosecutor. *United States v. Arroyo-Angulo* (C.A.2, 1978), 580 F.2d 1137, 1146-1147. See, also, *People v. Manning* (1990), 434 Mich. 1, 18, 450 N.W.2d 534, 541. Prosecutors ordinarily elicit information on plea agreements with witnesses during direct examination in order to blunt or foreclose unfavorable cross-examination revealing that they agreed to testify in exchange for favorable treatment by the prosecutor.

**{¶ 62}** Moreover, courts have split as to whether a truthful-testimony clause in a plea agreement invites the jury to rely on the prosecutor's assessment that the witness is testifying truthfully. Cf. *United States v. Roberts* (C.A.9, 1980), 618 F.2d 530, 536 (clause does invite reliance on prosecutor's assessment) with *United States v. Isaacs* (C.A.7, 1974), 493 F.2d 1124, 1165 (such an argument is "fanciful"). See, also, *Williams, supra,* 79 Ohio St.3d at 12-13, 679 N.E.2d at 657-658.

**{¶ 63}** In our view, these prosecutorial questions were not improper and did not prejudicially affect substantial rights of Cornwell. The questions concerning the plea bargains were brief, not overly emphasized, and were made at the close of the prosecutor's examination of each witness. Given the isolated nature of these particular questions to these three witnesses, these questions should not be misinterpreted, taken out of context, or given their most damaging meaning. *Donnelly v. DeChristoforo* (1974), 416 U.S. 637, 647, 94 S.Ct. 1868, 1873, 40 L.Ed.2d 431, 439; *State v. Hill* (1996), 75 Ohio St.3d 195, 204, 661 N.E.2d 1068, 1078. In sum, these brief prosecutorial questions did not deprive Cornwell of a fair trial. Therefore, we reject Proposition of Law VII.

### CONSTITUTIONALITY

**{¶ 64}** In Proposition of Law V, Cornwell argues that Ohio death-penalty

laws violate both the federal and state Constitutions. Cornwell concedes that this court has repeatedly held the death penalty in Ohio to be constitutional but states that we have not addressed some of the arguments he asserts in his brief. However, examination of the constitutional arguments raised by Cornwell indicates that all have been previously rejected by this court and may be summarily rejected. *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus. See, *e.g., State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264; *State v. Maurer* (1984), 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768; *Williams*, 79 Ohio St.3d 1, 679 N.E.2d 646; *State v. Buell* (1986), 22 Ohio St.3d 124, 22 OBR 203, 489 N.E.2d 795; *State v. Zuern* (1987), 32 Ohio St.3d 56, 512 N.E.2d 585; *State v. Mapes* (1985), 19 Ohio St.3d 108, 19 OBR 318, 484 N.E.2d 140; *State v. Steffen* (1987), 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383; *State v. Green* (1993), 66 Ohio St.3d 141, 609 N.E.2d 1253; *State v. Lorraine* (1993), 66 Ohio St.3d 414, 613 N.E.2d 212.

**{¶ 65}** In Proposition of Law VI, Cornwell contends that the voter-approved amendments to Sections 2 and 3, Article IV, Ohio Constitution, which eliminate court of appeals review in death-penalty cases, deprive him of his federal and state constitutional liberties. We rejected similar arguments in *State v. Smith* (1997), 80 Ohio St.3d 89, 684 N.E.2d 668, and reject Cornwell's arguments for the same reasons.

INDEPENDENT REVIEW AND PROPORTIONALITY

**{¶ 66}** Upon independent assessment, we find that the evidence supports beyond a reasonable doubt the aggravating circumstance that Cornwell killed Jessica Ballew and attempted to kill at least three other people as part of a course of conduct involving the purposeful killing or attempt to kill two or more persons. R.C. 2929.04(A)(5).

**{¶ 67}** The nature and circumstances of the offense provide no mitigating features. The facts of the drive-by shooting indicate that Cornwell and other gang

18

associates planned to retaliate against a rival gang member for a shooting that took place hours earlier. Upon arriving at the scene where he intended to exact revenge, Cornwell indiscriminately committed his crimes in order to "tell Boom this." All four victims, including Jessica Ballew, were simply in the wrong place at the wrong time. The fact that Cornwell and his associates had planned on killing Boom instead is of no consequence. See, *e.g., State v. Richey* (1992), 64 Ohio St.3d 353, 364, 595 N.E.2d 915, 925.

**{¶ 68}** We find some mitigating features in Cornwell's history, character, and background. Cornwell's maternal grandmother described Cornwell as "a lovable child" with whom she never had a problem. Two of Cornwell's sisters and a brother testified that Cornwell's father, Sidney Cornwell, Sr., was a crack addict and an alcoholic who was physically abusive to them and their mother. Cornwell's mother, Beverly Terry, testified that she bore one child prior to marrying Cornwell's father at age seventeen and that Cornwell was her fourth child. While both of Cornwell's parents had steady jobs, their marriage was always in a state of turmoil. At one point during Cornwell's childhood, Beverly removed herself and her children to the battered women's shelter at the local Y.W.C.A. for a short period of time.

**{¶ 69}** Eventually, Cornwell's parents separated and later divorced. During the separation, when Cornwell was approximately eight years old, Mr. Cornwell removed the children from Beverly's home in Youngstown while Beverly was at work. He took them to live with him at his home in nearby Wheatland, Pennsylvania. Thereafter, for approximately five years, Cornwell and his siblings lived with their father in Pennsylvania. During that period, Beverly was ordered to pay child support and was allowed to visit her children on weekends. When Cornwell was around thirteen years old, Beverly asked for custody of her children, and they then returned to live with her in Youngstown with her present husband.

**{¶ 70}** While growing up, Cornwell was overweight and was subjected to

recurring criticism and ridicule at school by his classmates. His mother nicknamed him "Corky" to discourage his peers from calling him "Porky." Cornwell was particularly self-conscious of the size of his breasts and, at age thirteen, he underwent cosmetic surgery to reduce their size in hopes of reducing the ridicule he received.

{¶ 71} While attending school in Youngstown, Cornwell was suspended twenty-four times between 1990 and 1995 for fighting and insubordination, and for being verbally vulgar and abusive to teachers and school authorities. According to his mother, Cornwell was also pressured at school by his peers to join a gang.

{¶ 72} The pastor of Cornwell's mother's church testified on Cornwell's behalf. He stated that after visiting Cornwell, he led him in a prayer of sincerity. He further stated that he sees sincerity in Cornwell, since Cornwell openly confessed his sinful life and received Christ into his life.

{¶ 73} Psychologist James Eisenberg testified that Cornwell functions in the low average to borderline range of intelligence, with a verbal IQ of 83. Based on various tests that he administered to Cornwell, Eisenberg described Cornwell as a person who is shy and fairly introverted and as one who lacks self-confidence and has low self-esteem. Eisenberg pointed out that when Cornwell was a child, his adult male role model was a crack-smoking father and that Cornwell was essentially raised by his older sisters.

{¶ 74} According to Eisenberg, no one was around to give Cornwell the discipline, structure, support, and affection he needed on a continuing basis to limit his dangerous behavior. Eisenberg thought that the gang gave Cornwell the kind of discipline, structure, and support that he did not receive from an effective male role model. Moreover, Cornwell's mother was often not around when Cornwell was suspended from school, and her influence on his conduct was minimal. Among other things, Eisenberg concluded that while Cornwell has no mental disease or defect, his intellectual ability is close to that of a thirteen- or fourteen-year-old. In

essence, Cornwell grew up in a violent and chaotic family, which caused him serious problems of identity and dependency.

{¶ 75} With regard to the statutory mitigating factors, we afford some weight to R.C. 2929.04(B)(4), since Cornwell was nineteen years old at the time of the offense. We also assign weight to Cornwell's lack of any prior criminal record as an adult.

{¶ 76} Under factor 7, several facts brought out during the sentencing phase are mitigating. Cornwell's chaotic family history and background, including coming into the world as an unwanted child, and having been abused by his father, a crack addict, should be given weight in mitigation. Also militating against the death penalty is the fact that Cornwell has the love and support of his mother, siblings, and other family members. See *Smith*, 80 Ohio St.3d 89, 121, 684 N.E.2d 668, 696.

{¶ 77} However, upon independent weighing, we find that the aggravating circumstance outweighs the mitigating factors beyond a reasonable doubt. The testimony of Meadows identifying Cornwell as the gunman and the corroborating testimony of Cornwell's accomplices leave no reasonable doubt as to Cornwell's guilt in the course-of-conduct murder of a three-year-old child and attempted murder of three adults who simply happened to be at the place where gang members hoped to find their intended victim. Cornwell's murderous conduct merits the capital penalty to which he was sentenced.

{¶ 78} We find the death sentence imposed in this case to be neither excessive nor disproportionate when compared with similar cases of murder as part of a course of conduct involving the purposeful killing of two or more persons. See, *e.g., State v. Davie* (1997), 80 Ohio St.3d 311, 686 N.E.2d 245 (nineteen-year-old offender, lack of a significant criminal history, conduct disorder); *State v. Awkal* (1996), 76 Ohio St.3d 324, 667 N.E.2d 960 (poor background, did not finish school, physically abusive father, remorseful, gainfully employed, no prior criminal

record); *Allard*, 75 Ohio St.3d 482, 663 N.E.2d 1277 (raised in foster homes, sexually abused as a child, manic-depressive disorder, remorseful); and *State v. Mitts* (1998), 81 Ohio St.3d 223, 690 N.E.2d 522 (loved by his family and was a devoted father, gainfully employed, protective of siblings, honorably served in the Coast Guard, remorseful, no prior criminal record). All four of those capital cases featured as much mitigation as is present in the instant case, if not more. We affirmed the death penalty in all four cases.

{¶ 79} Based on all the foregoing, we affirm Cornwell's convictions and sentences, including the death sentence.

*Judgment affirmed.*

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, COOK and LUNDBERG STRATTON, JJ., concur.