JOURNAL ENTRY OPINION
Appellant Ricardo Gray appeals the judgment of the trial court finding him guilty of murder with a firearm specification and felonious assault with a firearm specification, and sentencing him to a definite aggregate twenty-three year term of incarceration.[1]
Appellant assigns the following four errors for our review:
 I. PROSECUTORIALCONDUCT DEPRIVED THE APPELLANT OF HIS RIGHT TO A FAIR TRIAL.
 II. THE APPELLANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO BE PRESENT AT EVERY CRITICAL STAGE OF HIS TRIAL.
 III. PREJUDICIAL HEARSAY WAS ADMITTED INTO EVIDENCE WHICH DENIED THE APPELLANT HIS RIGHT OF CONFRONTATION.
 IV. THE APPELLANT WAS DENIED HIS RIGHT TO A FAIR AND IMPARTIAL JURY.
Having reviewed the record and the arguments of the parties, we affirm the judgment of the trial court. The apposite facts follow.
On November 30, 1998, the Cuyahoga County Grand Jury indicted appellant Ricardo Gray on one count of aggravated murder with a firearm specification and two counts of attempted aggravated murder with a firearm specification. The charges arose in connection with the shooting death of James D. Russell and the attempted shooting of Arthur Jackson and Mike LNU (last name unknown), following an altercation between two groups of young men near the corner of East 143rd Street and Kinsman on September 1, 1998.[2] Gray entered a plea of not guilty and requested a jury trial.
The trial began on February 8, 1999. During the voir dire a prospective juror asked to speak with the trial judge outside the presence of the other prospective jurors when asked whether she, a friend, or relative had ever been charged with a crime. In response, the court held an in camera voir dire in chambers with prosecution and defense counsel present. Defense counsel waived Gray's presence. During the in camera proceeding the juror indicated the state convicted her son of fraud. Upon questioning by the court, prosecution and defense counsel, the juror stated her son told her of his guilt, she felt the justice system treated her son fairly. She also stated she could be fair to both the prosecution and the defense. After completing the voir dire of this prospective juror defense counsel chose not to challenge for cause, stating I pass for cause. I don't believe there is cause. The parties seated the juror without further challenge.
The prosecution's case in chief began with Assistant County Coroner, Andrea McCollom. She testified she performed the autopsy on James D. Russell. Further she established Russell's cause of death as a gunshot wound to the back with vascular and visceral injuries. The next two witnesses Deanine Smith and Gary Blanchard testified to seeing and hearing a commotion near their home located on East 143rd Street. The commotion involved a large group of people located near the intersection of East 143rd and Kinsman. Both witnesses testified to hearing glass breaking, yelling and gunshots. Gary Blanchard testified that after the commotion stopped, James Russell knocked on his door and asked to enter his home. Gary Blanchard refused. A few minutes later Blanchard came out on his porch where he heard the sound of breathing coming from the side of the house. He looked over the side of the porch and discovered Russell lying face down in the bushes. Upon finding Russell, Blanchard asked Ms. Smith to call the police.
Arthur Jackson testified that on September 1, 1998 a group of his friends from the Bartlett area got into a fight with a group of guys from the Kinsman area. The fight broke up when the two sides thought they heard police sirens and scattered. Jackson returned to the area of the fight a short time later with his friends James Russell and Mike. On returning they saw Ricardo Gray coming toward them on a bike. Jackson testified Ricardo Gray started shooting as he rode toward Jackson and his friends. When they heard the gunshots Jackson, Mike, and James Russell ran east up 143rd Street. Jackson testified he heard bullets, like bees in his ears. Jackson said he returned approximately fifteen minutes later and learned that James Russell had been shot. Jackson spoke with police officers the following morning and told them Ricardo Gray killed James Russell.
Anthony Mixon testified that he saw Gray coming down East 143rd Street riding a mountain bike. Mixon testified Gray pulled out a gun as he rode past him. Mixon stated Gray rode down East 143rd and fired the gun until it was empty. Mixon stated the gun appeared to be a nine millimeter handgun and he heard approximately fourteen shots.
Officer Randall Presti testified he responded to a call he received on September 1, 1998 at 9:00 PM of a large fight in progress with shots fired, with one male shot. On arriving at the scene he found James Russell at Gary Blanchard's and waited with the victim for the ambulance to arrive. Once the ambulance arrived Presti testified Arthur Jackson approached him and provided the name of the shooter, Ricardo Gray. Officer Presti later searched the area where the altercation and shooting occurred. He found fourteen nine millimeter spent shell casings. He marked the location of the casings. Additionally Presti testified he went to Gray's mother's home several days after the incident. He saw Gray in the backyard. Officer Presti testified that Gray fled when he approached the home and he was unable to catch Gray at that time.
On cross examination, Officer Presti admitted to sitting in the courtroom during fifteen to twenty minutes of Gary Blanchard's testimony. Gray moved for a mistrial. The prosecutor stated he saw Presti bring in some interested people and then saw him leave. The prosecutor stated he was not aware Presti stayed in the courtroom during testimony. The court, finding that Presti's testimony could not have been influenced by Blanchard, overruled Gray's request for a mistrial and permitted Presti's testimony to stand.
Officer John Pak testified he confiscated the fourteen shell casings found at the scene. Detective Ronald Ehrbar, a firearms examiner with the Cleveland Department's Forensic Laboratory, testified the fourteen shell casings found at the scene all came from the same nine millimeter weapon. Additionally, he testified the spent pellet removed from the James Russell's body was consistent with being fired by a nine millimeter weapon.
Detective Beaman testified he interviewed both Arthur Jackson and Anthony Mixon the day following the shooting. He stated that both witnesses named Ricardo Gray as the shooter. Beaman also testified he interviewed Gray following his arrest. Beaman stated Gray said he did not do the shooting but knew who did. However Beaman stated Gray did not provide any names and requested to speak with his attorney.
The prosecution's final witness Patrolman John Hall testified officers made several attempts to locate Ricardo Gray for the two months following the shooting. Hall stated he and several other officers finally located Gray at his grandmother's house on November 20, 1998. Hall and his partner positioned themselves in the backyard. When the officers identified themselves Gray attempted to flee by exiting a second door which led to an unfinished porch. The only way to reach the ground was to climb down or jump. For this reason, Hall believed Gray was attempting to escape. Hall testified he ordered Gray to stop, and lie down in the house. Gray cooperated. Hall stated other officers then entered the house from the front and arrested Gray.
Gray presented three witnesses in his defense, James Thompson, Charles Williams, and London Hill. Gray did not take the stand. Thompson testified he participated in the fight on September 1, 1998. He stated he saw Ricardo Gray get hit in the head with a stick. Thompson said Gray fell down in front of him after being hit. Thompson said he grabbed Gray and dragged him across the street to a friend's car. He put Gray in the car and the friend pulled off. Thompson then went back across the street to continue fighting. Thompson said at that point he heard gunfire. He testified to seeing a young man named Benny running down the street shooting. Thompson said when he saw Benny coming down the street he ran around the corner on 144th. Thompson stated he did not see any one else shooting that evening. Further, he testified Gray left shortly before the shooting started. Thompson stated that he never provided this information to the police because he had been involved in the fight.
Charles Williams testified he witnessed his friends James Thompson and Ricardo Gray near the area of the fight on the evening of September 1, 1998. Williams stated Gray was bleeding. Williams said he started across the street toward Gray when he heard shooting, so he ran. Williams also named Benny as the shooter. Williams did not provide this information to the police.
London Hill, the final defense witness, testified he saw the fight on September 1, 1998, but did not participate in it. He said he saw Thompson pull Gray across the street. About a minute later, Hill said he heard gunfire. Hill named Benny as the shooter. Hill testified he did not know Benny's last name. Hill testified that he contacted the police a couple days following the shooting. He said he spoke with a female officer and told her he witnessed the shooting. Hill said he also told her that Benny did the shooting. Hill stated the officer took his name and number, and indicated that a detective investigating the case would call. Hill said the police did not call. Following Hill's testimony, the defense rested.
Prior to beginning closing arguments, the court learned that a juror decided to get the newspaper account of the shooting. The juror found an article in a September edition of the Plain Dealer. The juror brought in a copy of the article and told other jurors he would share it with them following deliberations. The prosecution and defense counsel both agreed to excuse the over zealous juror. Further, at the request of defense counsel, the court conducted a hearing to determine what if anything the excused juror said to the remaining jurors regarding the article. The court, with counsel present, questioned each juror individually. Only three jurors admitted to having a conversation with the excused juror about the article. Each of the three indicated the excused juror did not reveal the facts or nature of the article. Rather, he told them the article was extensive and indicated he would show it to them after deliberations. The court gave Gray's counsel the opportunity to question the jurors. Gray's counsel did not object to retaining the three jurors.
With the juror influence hearing completed, the court granted a motion by the prosecution to permit the jury to consider the lesser included offenses of murder and felonious assault.
The jury found Gray not guilty of aggravated murder and aggravated attempted murder. However, they found Gray guilty of the lesser included offenses of murder and attempted felonious assault with a firearm specification. Accordingly the trial court sentenced Gray to a term of twenty three years imprisonment fifteen years for murder, five years for felonious assault and three years for each firearm specification (merged).
In his first assignment of error, Gray argues that the prosecutor deprived him of a fair trial by failing to inform the court that a prosecution witness was present in the courtroom prior to giving testimony, asking improper questions of witnesses, and making improper remarks during closing.
A prosecutor commits misconduct in failing to enforce a separation of witnesses order only where the prosecutor procured or connived the witness' disobedience of the order. See State v. Cox (1975), 42 Ohio St.3d 200, 327 N.E.2d 639, paragraph one of the syllabus. Here, the record fails to reveal any evidence suggesting the prosecutor procured or connived any witness to disobey the court's order for separation. Additionally, Gray fails to demonstrate that he suffered material prejudice resulting from the witness' presence. Material prejudice is not established by the mere fact that one witness overhears the testimony of another witness. State v. Woods (June 25, 1992), Cuyahoga App. No. 60585, unreported. The appellant must demonstrate that what the witness heard impacted or influenced his testimony. Id.
In the instant case, the record indicates that one prosecution witness, Officer Presti was present in the courtroom during a portion of Gary Blanchard's testimony. However, the record fails to demonstrate any influential impact on Presti's testimony as a result of his hearing a portion of Blanchard's testimony.
Next Gray argues the prosecutor's conduct in questioning witnesses and making improper remarks during closing deprived him of a fair trial. The test for prosecutorial misconduct is whether remarks or questions were improper and, if so, whether they prejudiciallyaffected substantial rights of the accused. State v. Cornwell (1999), 86 Ohio St.3d 560, 715 N.E.2d 1144; State v. Apanovitch(1987), 33 Ohio St.3d 19, 24, 514 N.E.2d 394, 400; State v. Smith (1984), 14 Ohio St.3d 13, 14-15, 470 N.E.2d 883, 885. Similarly, where the defendant fails to object to alleged misconduct, the standard of review becomes that of plain error. State v. Fears (1999), 86 Ohio St.3d 329, 715 N.E.2d 136; State v. Bey (1999) 85 Ohio St.3d 487, 709 N.E.2d 484; State v. Slagle (1992), 65 Ohio St.3d 597, 605 N.E.2d 916. Plain error is an error or defect in the trial proceedings affecting substantial rights, where but for the error, the outcome of the trial clearly would have been otherwise. State v. Underwood (1983), 3 Ohio St.3d 12,444 N.E.2d 1332, syllabus.
Gray asserts the prosecutor improperly commented, during closing argument, on his right to seek the advice of counsel by stating
 Now folks, also [Gray] has an attorney at this point in time. He mentions to Officer Beaman that he's represented by Almeta Johnson. Now I ask this question. If he didn't commit this crime and he didn't shoot anybody and he knows who did, why do you have to consult an attorney first? It's not necessary.
[Trans. at p. 744]. Gray failed to raise an objection to the prosecutor's remarks.
Gray also argues the prosecutor engaged in a pattern of asking leading questions of prosecution witnesses. Gray cites the following exchanges between the prosecutor and key witness Arthur Jackson as examples:
 Q: Let me stop you for one second. Ricardo Gray —
A: Yes?
Q: — do you see him in the courtroom today?
A: Yes
Q: Can you please point him out?
A: Yes.
* * *
 Q: You kept getting closer to Ricardo Gray as he was shooting?
A: I was running away from him.
* * *
Q: did you see the gun?
A: No, I didn't see the gun.
Q: At what point did you see the gun?
 A: I just seen [sic] him holding something by the time he got to the window.
[Tr. pp. 240-241, 290-291.] Here again, Gray failed to object to the prosecutor's conduct.
Regardless of the lack of objections, we find the prosecutor's conduct objectionable, improper, unprofessional and unnecessary. When the prosecutor makes comments about a defendant's request for his lawyer on a record such as this where the evidence overwhelmingly supports guilt, we are doubly concerned. We are concerned because we are required to uphold the conviction, but the damaged comment remains without any scrutiny. The Constitution guarantees a defendant a right to an attorney and the Constitution forbids us from attaching any significance to that request, which includes commenting on the request. Consequently, our system of justice is best served and enhanced without such comments, and the trial court should seize the opportunity to issue a curative instruction whenever the prosecutor crosses the line as was done here. Again, we find the prosecutor's comments repugnant to our system of justice and fair play, but not reversible prejudicial error.
As we stated earlier, the touchstone of analysis is the fairness of the trial, not the culpability of the prosecutor. Bey, quoting Smith v. Phillips (1982), 455 U.S. 209, 219,102 S.Ct. 940, 947, 71 L.Ed.2d 78, 87. Gray fails to demonstrate that without the prosecutor's remarks and the brief presence of Officer Presti in the court room during the testimony of Gary Blanchard, the jury would have found him not guilty. Other evidence places Gray at the scene. Even the defense witnesses admit Gray's involvement in the altercation that proceeded the shooting. Finally, two eye witnesses, familiar with Gray, identify him as the shooter. Based on our review of the entire record, we conclude that none of the alleged instances of misconduct, standing alone or taken together, deprived Gray of a fair trial. Therefore, we overrule Gray's first assignment of error.
In his second assignment of error, Gray argues that the trial court erred in failing to ensure his presence at an in camera voir dire proceeding to determine a juror's fairness and impartiality. Gray contends that this failure violated his constitutional right to be present at every critical stage of his trial. We disagree.
Failure to ensure the defendant's presence at every stage of the trial constitutes prejudicial error only where a fair and just hearing * * * is thwarted by his absence. State v. Williams (1983),6 Ohio St.3d 281, 286, 452 N.E.2d 1323, 1330 quoting Snyder v. Massachusetts(1934), 291 U.S. 97, 108, 54 S.Ct. 330, 78 L.Ed. 674. No prejudicial error exists in failing to ensure a defendant's presence during a voir dire proceeding where the defendant's counsel participated in the voir dire, and defendant's conduct was not at issue during the proceeding. Id.
In the instant case, Gray's counsel participated in the in cameravoir dire proceeding. Additionally, Gray's attendance would have contributed little to his defense as his conduct was not at issue in the voir dire proceeding. Therefore, we conclude no prejudicial error resulted from the trial court's failure to secure Gray's attendance during the voir dire proceeding. Accordingly, we overrule Gray's second assignment of error.
In his third assignment of error, Gray argues that the trial court erred by admitting prejudicial hearsay into evidence, over his objection. Gray contends that by so doing, the trial court denied him the right of confrontation. To address this assignment of error, first we must determine whether the trial court erred in admitting the statement to which Gray objected. See State v. Chappell(1994), 97 Ohio App.3d 515, 646 N.E.2d 1191. Then, if the trial court erred, we must determine whether Gray suffered any prejudice as a result. Id.
Gray objected to the following exchange between the prosecutor and Officer Beaman:
 A: Out of thirty or forty boys that were there, we found two young men that were willing to come forward. * * *
 Q: And I believe you testified on September 2nd of `98 is when you requested a warrant be issued for the arrest of Ricardo Gray?
A: Yes I did.
 Q: And was it your testimony that all those young men were present on East 143rd and Kinsman on September 2nd, `98 were willing to speak to you?
 A: Yes there were others that wanted to say things — Ms. Johnson: Objection
Court: Overruled
 A: There were other guys that appeared to want to talk, but they were all saying that they were scared.
[Tr. p. 437.]
We find the trial court's admission of Officer Beaman's testimony regarding what the others said in error. We agree with appellant's contention that the testimony could create the impression others would have identified Gray, but failed to do so out of fear. However, we find in light of the record, no prejudice to Gray resulted from the admission of this testimony. Therefore, we overrule Gray's third assignment of error.
In his fourth assignment of error, Gray argues the court denied his right to a fair and impartial jury. Specifically, Gray alleges the trial court failed to ask three jurors who admitted the excused juror told them he found an article written by the Plain Dealer about the incident, whether they could still be fair and impartial. Gray contends the court's failure to ask this crucial question prevented him from making an informed decision as to whether or not other members of the jury should also have been excused.
Where a party raises the question of outside influence or information impacting a juror the trial court must hold a hearing to determine whether the communication biased the juror. State v. Johnson(2000), 88 Ohio St.3d 95, 723 N.E.2d 1054; see, also State v. Keith (1997), 79 Ohio St.3d 514, 684 N.E.2d 47. In such a case, the trial court possesses broad discretion in dealing with the contact and determining whether to declare a mistrial or to replace an affected juror. Id; Keith. The court is not required to specifically ask whether a juror remains impartial. A court may determine that a juror's impartiality remains unaffected based upon that juror's testimony. State v. Sheppard (1998), 84 Ohio St.3d 230,233, 703 N.E.2d 286, citing Smith v. Phillips (1982),455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78.
In the instant case, the record demonstrates the trial court conducted a hearing at which the court permitted counsel to question the jurors. Gray failed to object to any of the juror remaining seated on the case. By failing to object at trial, Gray waived all but plain error. See State v. Keith (1997), 79 Ohio St.3d 514,684 N.E.2d 47; State v. Williams (1997) 79 Ohio St.3d 1,679 N.E.2d 646. We find the trial court, promptly addressed the allegation of outside influence, determined the facts, and the impact on each affected juror. Therefore, we find no abuse of discretion or plain error on the part of the trial court. Accordingly, we overrule Gray's fourth assignment of error.
It is ordered that appellee recover of appellant its costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
PATTON, P.J., and KILBANE, J., CONCUR.
PATRICIA ANN BLACKMON, JUDGE
[1] The court sentenced appellant to twenty three years imprisonment fifteen years for murder, five years for felonious assault and three years for each firearm specification (merged).
[2] Prosecution dropped the count of attempted aggravated murder based on Mike LNU prior to trial because they were unable to locate the alleged victim.