This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
{¶ 1} Defendant, Michael Kish, appeals from the judgment of the Lorain County Court of Common Pleas, which convicted him of possession of drugs. We affirm.
 {¶ 2} In July of 2000, the Lorain County Grand Jury charged Defendant with two counts of possession of drugs, in violation of R.C.2925.11(A). A major drug offender specification was sought in regards to count one and forfeiture of the property used or intended to be used to facilitate the commission of the felony drug offense was sought in regards to counts one and two. Defendant pled not guilty to both counts. Thereafter a jury trial was held. Defendant was found guilty on all counts and was sentenced accordingly.
 {¶ 3} Defendant waived his right for the jury to consider the issue of criminal forfeiture and the matter was heard by the trial court. Upon concluding that forfeiture in the instant case would constitute an excessive fine, the court denied the State's forfeiture specification of the indictment.
 {¶ 4} Defendant timely appealed raising six assignments of error for review. The State filed a cross-appeal raising one cross-assignment of error for our review.
 ASSIGNMENT OF ERROR I "The trial court abused its discretion by denying [Defendant's] challenge for cause of venire person Brand to the prejudice of [Defendant]."
 {¶ 5} In his first assignment of error, Defendant contends that the court erred in failing to discharge a juror for cause. Specifically, Defendant maintains that the juror was biased in favor of the State. As a result, Defendant claims he was prejudicially forced to use peremptory challenges to excuse such juror. We disagree.
 {¶ 6} R.C. 2313.42(J) states that good cause exists for the removal of a prospective juror when "he discloses by his answers that he cannot be a fair and impartial juror or will not follow the law as given to him by the court." Trial courts have considerable discretion when determining a juror's ability to be impartial. State v. Cornwell (1999),86 Ohio St.3d 560, 563. "A prospective juror who has been challenged for cause should be excused `if the court has any doubt as to the juror's being entirely unbiased.'" Id. quoting R.C. 2313.43. See, also, State v.Maldonado (Sept. 12, 2001), 9th Dist. No. 01CA007759, at 4. The trial court is entitled to accept the juror's assurances that he will be fair and impartial and will decide the case on the basis of the evidence.State v. Jones (2001), 91 Ohio St.3d 335, 338, quoting Wainwright v.Witt (1985), 469 U.S. 412, 424, 83 L.Ed.2d 841. "Deference must be paid to the trial judge who sees and hears the juror." Jones,91 Ohio St.3d at 338, quoting Wainwright, 469 U.S. at 426. The trial court's decision will not be overturned on appeal unless it is manifestly arbitrary so as to constitute an abuse of discretion. Maldonado, supra, at 4, citingCornwell, 86 Ohio St.3d at 563. An abuse of discretion is "more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." Blakemore v. Blakemore
(1983), 5 Ohio St.3d 217, 219. When applying the abuse of discretion standard, an appellate court may not substitute its judgment for that of the trial court. Pons v. Ohio State Med. Bd. (1993), 66 Ohio St.3d 619,621.
 {¶ 7} In the instant case, during voir dire, a potential juror, Mr. Brand, indicated that he may be biased in favor of the prosecution. Mr. Brand initially stated that if a police officer were to testify, his testimony would "take more weight from [him.]" When this potential bias was further discussed, Mr. Brand alleged that he would try to "think outside that box" if instructed that he was acting contrary to law. Additionally, he indicated that he could be fair and impartial to the State and Defendant. As a trial court has considerable discretion when determining a juror's ability to be impartial, we are unable to conclude that the trial court abused its discretion when it denied Defendant's challenge for cause. Defendant's first assignment of error is overruled.
 ASSIGNMENT OF ERROR II "The trial court erred by ordering defense counsel not to speak to [Defendant] over a lunch break during trial."
 {¶ 8} In his second assignment of error, Defendant argues that he was denied his Sixth Amendment right to counsel because the trial court instructed him not to consult with his attorney during a break in his testimony. Defendant's assertion is not well taken.
 {¶ 9} Evid.R. 611(A) authorizes the court to exercise reasonable control over the mode and order of witness examination and presenting evidence. In the instant case, the trial court ordered that the defense attorney refrain from discussing Defendant's testimony with him during the lunch recess. Defendant maintains that his Sixth Amendment rights were thus violated. However, the United States Supreme Court has held that a defendant does not have a constitutional right to consult with his attorney while testifying: "when a defendant becomes a witness, he has no constitutional right to consult with his lawyer while he is testifying. He has an absolute right to such consultation before he begins to testify, but neither he nor his lawyer has a right to have the testimony interrupted in order to give him the benefit of counsel's advice." Perryv. Leeke (1989), 488 U.S. 272, 281, 102 L.Ed.2d 624. See, also, State v.Henness (1997), 79 Ohio St.3d 53, 60 (stating that trial courts may forbid attorney-witness contact between direct and cross-examination to avoid an appearance of impropriety). The Supreme Court recognized that the Federal Constitution does not compel every judge to permit a defendant to consult with his lawyer while his testimony is in progress if the testimony is interrupted momentarily for good reason. Perry,488 U.S. at 284-85. Consequently, not every restriction placed on the counsel's opportunity to consult with his client will violate a defendant's Sixth Amendment right to counsel. State v. Coleman (1999),85 Ohio St.3d 129, 143, citing Morris v. Slappy (1983), 461 U.S 1, 11,75 L.Ed.2d 610.
 {¶ 10} As a defendant possesses no constitutional right to discuss his testimony while it is in progress, we are unable to conclude that the trial court erred in instructing defense counsel not to speak with Defendant during the brief lunch recess which interrupted his cross-examination. See Perry, 488 U.S. at 283-84. Accordingly, Defendant's second assignment of error is overruled.
 ASSIGNMENT OF ERROR III "The trial court abused its discretion by failing to permit [Defendant's] trial counsel to examine [Defendant] concerning a trip from El Paso, Texas to Ohio about which [the State] had previously examined one of its witnesses, to the prejudice of [Defendant]."
 {¶ 11} In his third assignment of error, Defendant alleges that the trial court abused its discretion by limiting the cross-examination of the State's witness. Defendant's assignment of error lacks merit.
 {¶ 12} The Sixth Amendment to the United States Constitution provides a defendant the right to confront and cross-examine witnesses on relevant issues. Delaware v. Van Arsdall (1986), 475 U.S. 673, 678-79,89 L.Ed.2d 674. However, the Ohio Supreme Court has held that although the "[c]ross-examination of a witness is a matter of right, *** the `extent of cross-examination with respect to an appropriate subject of inquiry is within the sound discretion of the trial court.'" State v. Green (1993),66 Ohio St.3d 141, 147, quoting Alford v. United States (1931),282 U.S. 687, 694, 75 L.Ed. 624. See, also, State v. Palmer (Feb. 8, 1995), 9th Dist. No. 2323-M, at 14. Therefore, a trial court is given considerable discretion "to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." State v.Lute (Nov. 22, 2000), 9th Dist. No. 99CA007431, at 17, quoting VanArsdall, 475 U.S. at 679. It is within a trial court's discretion to determine whether testimony is relevant, and an appellate court may not interfere with a trial court's decision absent an abuse of discretion.State v. Younker, 2nd Dist. No. 02CA1581, 2002-Ohio-5376, at ¶ 9.
 {¶ 13} The Confrontation Clause guarantees only an opportunity for effective cross-examination, and not cross-examination to whatever extent the defense may wish. Stow v. Berchenko (Nov. 8, 1995), 9th Dist. No. 17197, at 2-3. Accordingly, an appellate court that is reviewing restrictions imposed on the scope of cross-examination must determine whether a defendant was denied an opportunity for effective cross-examination. State v. Lopez (1993), 90 Ohio App.3d 566, 575.
 {¶ 14} At trial, the court would not permit defense counsel to question Defendant concerning a March, 2000 trip to El Paso, Texas, as it was irrelevant to the instant case. Although Defendant's attorney agreed that under normal circumstances this particular line of questions would be irrelevant, he argued that in this case, he should be permitted to continue his line of questioning for rebuttal purposes because Andrea Faulstich ("Faultstich") "testified about this trip herself in the State's [c]ase, and said [that] drugs were transported." However, upon review of the record, we find that the prosecutor did not question Faulstich about one specific trip from El Paso involving the transporting of illegal drugs. Rather, questions were posed to Faulstich regarding whether she had taken any trips to or from El Paso with Defendant. Faulstich responded that she had driven from El Paso to Ohio with Defendant in the past. No mention of illicit drugs was made, as Defendant's counsel suggests. The prosecutor merely sought to clarify the repeated references Faulstich was heard making on the tape which was played at trial to these trips and the rest area that they stopped at. Accordingly, the trial court did not abuse its discretion by limiting defense counsel's inquiries into a specific March, 2000 trip from El Paso, Texas. Defendant's third assignment of error is overruled.
 ASSIGNMENT OF ERROR IV "The trial court abused its discretion by failing to grant [Defendant's] repeated motions for a mistrial based upon prosecutorial misconduct, to the prejudice of [Defendant]."
 {¶ 15} In his fourth assignment of error, Defendant avers that the trial court erred by denying his motions for mistrial due to alleged prosecutorial misconduct. We disagree.
 {¶ 16} "A mistrial should not be ordered in a criminal case merely because some error or irregularity has intervened[.]" State v. Reynolds
(1988), 49 Ohio App.3d 27, 33. A mistrial is necessary only when a fair trial is no longer possible. State v. Franklin (1991), 62 Ohio St.3d 118,127. Moreover, the granting or denial of a mistrial rests in the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. See State v. Sage (1987), 31 Ohio St.3d 173,182.
 {¶ 17} In deciding whether a prosecutor's conduct rises to the level of prosecutorial misconduct, a reviewing court determines if the conduct was improper, and, if so, whether the substantial rights of the defendant were actually prejudiced. State v. Smith (1984),14 Ohio St.3d 13, 14. "Isolated comments by a prosecutor are not to be taken out of context and given their most damaging meaning." State v.Hill (1996), 75 Ohio St.3d 195, 204. Moreover, the defendant must show that there is a reasonable probability that but for the prosecutor's misconduct, the result of the proceeding would have been different. Statev. Loza (1994), 71 Ohio St.3d 61, 78-79.
 {¶ 18} In this case, Defendant maintains that the prosecutor made improper remarks during closing arguments. More specifically, the prosecutor made the statements that "[Defendant's] attitude on the witness stand should tell you that he's not telling the truth[,]" and "[Defendant's] got motive to lie. He has reason to lie." Defendant's counsel then objected and requested to approach the bench. Out of the hearing of the jury, the trial court warned the prosecutor about his comments. The jury was then instructed that they were to determine issues of credibility.
 {¶ 19} As Defendant has failed to show that any actions by the prosecutor denied him a fair trial, we conclude that the trial court did not abuse its discretion by failing to grant a mistrial for prosecutorial misconduct. See Sage, 31 Ohio St.3d at 182.
 {¶ 20} Additionally, Defendant alleges that the prosecutor improperly used the word "lie" during his cross-examination of Defendant. "As a general rule cross-examination is `permitted on all relevant matters and matters affecting credibility.'" State v. Slagle
(1992), 65 Ohio St.3d 597, 605, quoting Evid.R. 611(B). The scope of cross-examination lies within the sound discretion of the trial court in relation to the particular facts of the case. Slagle,65 Ohio St.3d at 605, quoting State v. Acre (1983), 6 Ohio St.3d 140, 145. A court's ruling will not be reversed on appeal absent a clear showing of an abuse of discretion. Slagle, 65 Ohio St.3d at 605.
 {¶ 21} In the present case, the prosecutor properly sought to impeach Defendant's credibility. Specifically, the prosecutor posed the following question to Defendant: "So if the jury hears you saying that on that tape, you'll agree with me, you lied to this jury[?]" We conclude, that the prosecutor's cross-examination of Defendant properly sought to impeach his credibility. The prosecutor fairly sought to point out the contradictions between the evidence and Defendant's testimony. Consequently, this Court is unable to conclude that the trial court abused its discretion by overruling defense counsel's motion for a new trial. Defendant's fourth assignment of error is overruled.
 ASSIGNMENT OF ERROR V "The trial court abused its discretion by permitting [the State] to publish a purported transcript of surveillance tapes to the jury, over [Defendant's] repeated objections."
 {¶ 22} In his fifth assignment of error, Defendant asserts that the trial court erred when it permitted the jury to use inaccurate transcripts of surveillance tapes as listening aides during trial. Defendant's assertions are not well taken.
 {¶ 23} Although Defendant's counsel recognized that it was within the trial court's discretion to permit the use of accurate transcripts as listening aids, counsel maintains that the accuracy of the transcripts provided to the jury in the instant case is "greatly at issue." See Statev. Blankenship (May 22, 1985), 9th Dist. No. 2050, at 5 (stating that "[a]ccurate transcripts, used contemporaneously with the introduction of tape recordings into evidence, are admissible to assist the jury in following the recordings while they are being played"). He alleges that the transcripts were presumptive and biased in favor of the State. However, we find that the transcripts necessary for the review of this alleged error were not made part of the record on appeal.
 {¶ 24} It is an appellant's responsibility to provide the reviewing court with a record of the matters that are necessary to support his assignments of error. State v. Benjamin (Nov. 15, 2000), 9th Dist. No. 00CA0026, at 3. Without an adequate record, "a court of appeals must `presume [the] regularity of the [trial] court's judgment[.]'"Friess v. Hague (Aug. 6, 1997), 9th Dist. No. 96CA006518, at 7. See, also, Ferrone v. Kovack, 9th Dist. No. 3279-M, 2002-Ohio-3625, at ¶ 8. Accordingly, Defendant's fifth assignment of error is overruled.
 ASSIGNMENT OF ERROR VI "[Defendant's] convictions are against the manifest weight of the evidence."
 {¶ 25} In his sixth assignment of error, Defendant maintains that his convictions for possession of drugs were against the manifest weight of the evidence. Defendant's argument lacks merit.
 {¶ 26} "[A] manifest weight challenge questions whether the state has met its burden of persuasion." State v. Gulley (Mar. 15, 2000) 9th Dist. No. 19600, at 3, citing State v. Thompkins (1997), 78 Ohio St.3d 380,390 (Cook, J. concurring). When a defendant asserts that his conviction is against the manifest weight of the evidence, "an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v.Otten (1986), 33 Ohio App.3d 339, 340. This discretionary power should be invoked only in extraordinary circumstances when the evidence presented weighs heavily in favor of the defendant. Id.
 {¶ 27} Defendant was found guilty of, and appeals his convictions for, possession of drugs, in violation of R.C. 2925.11(A). That section provides, "[n]o person shall knowingly obtain, possess, or use a controlled substance." R.C. 2925.11(A). One "acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B).
 {¶ 28} In the present case, Detective Ray Taylor, of the Lorain County Sheriff's Department, testified on behalf of the State. Detective Taylor asserted that he came into contact with Faulstich in July of 2000, while he was posing as a drug buyer. Detective Taylor indicated that throughout their dealings, Faulstich had mentioned Defendant's name and had associated Defendant with the sale and purchase of illegal drugs. He testified that Faulstich was eventually arrested, on July 11, 2000. At this time, 240 pounds of marijuana was confiscated from her vehicle. The detective expressed that when Faulstich was presented with the opportunity to cooperate with law enforcement authorities, she agreed to become a confidential informant. He stated that these types of informants are used because authorities are unable to gain access to the "drug rings" and the informants are able to move the investigation process along more efficiently.
 {¶ 29} Detective Taylor indicated that thereafter, Faulstich began to communicate with Defendant in a controlled environment; Faulstich was under constant surveillance and was not permitted to have unsupervised contact with Defendant. Detective Taylor explained the procedure followed each time Faulstich had contact with Defendant. All telephone conversations were recorded and monitored. He stated that each time Faulstich met with Defendant, electronic transmission devices were fitted and concealed on her person. Faulstich was routinely search prior to the arranged meetings with Defendant and immediately after being taken back into custody. Detective Taylor indicated that Faulstich met with Defendant on three separate occasions. Two meetings were held at a restaurant and the third at Defendant's warehouse located in Lorain County. He maintained that Faulstich was under constant surveillance, by numerous law enforcement authorities, throughout these meetings. Detective Taylor personally observed Faulstich and Defendant conversing at the restaurant on one occasion.
 {¶ 30} On July 20, 2000, Faulstich was supplied with drugs to "sell" to Defendant. Detective Taylor explained that Faulstich was searched and then fitted with recording devices. Additionally, her car was searched and bugged with recording devices because the drugs were placed in her vehicle and the authorities wanted to capture as much conversation as possible on tape. Detective Taylor indicated that law enforcement authorities packed five kilos of cocaine and 30 pounds of marijuana into a black bag and placed it in the back of Faulstich's sport utility vehicle. He explained that Faulstich was instructed to "drive the vehicle directly to the location and advise [Defendant] it was in the trunk, open the trunk and say `there it is.'"
 {¶ 31} The detective also testified that he participated in the surveillance of Faulstich as she was en route to Defendant's warehouse. He stated that the warehouse was located in a wooded area and was rather isolated. The area was then "closed off" by the authorities who were monitoring the situation. Detective Taylor asserted that he was listening to the recording device and was able to hear Faulstich and Defendant walking around the premises. However, he was unable to see their actions from his position. When Detective Taylor heard Defendant's engine start, they were given the instructions to move-in and make the arrest. He explained that Faulstich was also "arrested" for appearance purposes. Detective Taylor stated that once on the warehouse property, he observed the unopened black bag in a cardboard box in the back of Defendant's van.
 {¶ 32} Additionally, Detective Taylor explained that throughout his undercover work, he has learned that individuals dealing in illicit drugs are creative and "try to *** use words on the phone and openly in public that a normal person would not suspect they were having a conversation with reference to drugs." He indicated that the terms used are taken in context in relation to the police investigations conducted and various background information received. Detective Taylor testified that in this particular transaction, the word "cabinets" referred to marijuana and "keys" referred to kilos of cocaine.
 {¶ 33} Faulstich, the confidential informant, was also examined at trial. She indicated that she has known Defendant for roughly eight years and had met him through a mutual friend. At the time of her arrest, Faulstich resided in El Paso, Texas where she became involved with Defendant in the drug business. Faulstich testified that Defendant loaned her $10,000 to purchase the marijuana she was transporting when arrested on July 11, 2000. She explained that Defendant had instructed her to buy the marijuana and ship it to Ohio; the $10,000 was a down payment for the purchase. Faulstich indicated that she also purchased some of the marijuana for Detective Taylor, who, unbeknownst to her, was an undercover officer posing as a drug buyer. She explained that upon her arrest, the law enforcement agents divulged information they had gathered which implicated herself and Defendant and then offered her an opportunity to help further their investigation of Defendant. Faulstich maintained that she chose to cooperate in exchange for a reduced sentence, probation time, or no jail time.
 {¶ 34} Faulstich testified that she then informed the authorities that she and Defendant had "worked with some marijuana prior to July 11th, on [or] about March of [2000]." She explained that they had "bought and sold marijuana" together from El Paso, Texas. Faulstich asserted that although Defendant would also request cocaine, she had never supplied him with any prior to his arrest. She also described to the police the language they would use when discussing drug deals. Faulstich indicated that Defendant would not use the words cocaine or marijuana throughout their conversations because dealers of illegal drugs do not want to risk saying anything incriminating. She stated that Defendant would use different words, such as "the other thing," "green," "cabinets," "weed," or "mailboxes," when referring to marijuana and cocaine. Faulstich explained that she also used these terms so as not to arouse Defendant's suspicions.
 {¶ 35} Faulstich indicated that from the time of her arrest until Defendant's arrest on July 20, 2000, she was under constant supervision. She was instructed on what to say and do while speaking and meeting with Defendant. Numerous phone calls between Faulstich and Defendant were recorded and admitted into evidence. At trial, Faulstich was able to identify the male voice on the recordings as Defendant's. Throughout their phone conversations, Faulstich recalled Defendant referring to "merchandise" Faulstich was to obtain. She also recalled him speaking of a "trade." Faulstich explained that this trade involved giving Defendant either $10,000 plus interest or cocaine instead of marijuana as originally planned. She stated that they discussed the purchase of "keys" of cocaine and their future dealings together. Defendant agreed that Faulstich's cut would be $1,000 per kilo. Faulstich testified that Defendant requested "30 weed" or "30 cabinets" and "5 mailboxes." She further explained that Defendant's requests for "30 cabinets" and "5 mailboxes" meant 30 pounds of marijuana and five kilos of cocaine. Faulstich stated that the terms "cabinets" and "mailboxes" were used because they pertained to Defendant's legitimate business, Duncan-Lakkes. She maintained that she was not an agent for Defendant's landscaping business and never procured actual mailboxes or cabinets for him to sell.
 {¶ 36} Additionally, Faulstich stated that Defendant mentioned a warehouse he owned in Elyria, Ohio. Defendant indicated that he was interested in selling it and inquired as to whether Faulstich or her "friends" would be interested in purchasing it. Faulstich explained that Defendant was unaware that her "friends" were undercover agents. Faulstich further explained that Defendant suggested meeting there to exchange the merchandise. She recalled Defendant emphasizing that the warehouse was located in a secluded place and describing that large coolers were inside the warehouse that trucks or forklifts could be driven up to. Faulstich acknowledged that coolers are important to sustain the life of marijuana and keep it fresh.
 {¶ 37} Faulstich maintained that Defendant then asserted he would trade his property for roughly "15 keys *** of coke[.]" She stated that in a subsequent phone conversation, she informed Defendant that if he wanted four or five kilos of cocaine he would then owe her money. Faulstich testified that Defendant then changed his request to two or three kilos, or "whatever [he was] covered for *** under the $10,000 loan." Faulstich stated that Defendant then inquired as to "how long *** it [was] going to be before [they] got any more weed[.]" Faulstich maintained that weed meant marijuana.
 {¶ 38} Lastly, Faulstich testified to the events of July 20, 2000, the day Defendant was arrested. She explained that after she was searched and wired, the detectives placed a black duffel bag containing 30 pounds of marijuana and 5 kilos of cocaine into the back of her sport utility vehicle. Faulstich then met Defendant at the designated meeting place and followed him to his warehouse. She acknowledged that she was under constant surveillance by the authorities. When they arrived at Defendant's warehouse, Faulstich explained that Defendant walked her around the perimeter and showed her the coolers inside. They then went outside to their vehicles. Faulstich stated that when it was time to exchange the bag, Defendant instructed her to pull her vehicle closer to avoid walking across the property with the bag in plain view. She asserted that Defendant then removed the bag and placed it into his van as he was talking about trying to "get rid of this shit[,]" namely the cocaine and marijuana, that night. Faulstich informed Defendant that "the white stuff [was] on one side and the green on the other." She asserted that "white stuff" referred to cocaine and "green" meant marijuana.
 {¶ 39} Faulstich indicated that immediately after the exchange, law enforcement authorities moved in and arrested Defendant. She explained that she was also arrested, for appearance purposes, and was then taken to her hotel and was debriefed and searched. Faulstich was then free to return to El Paso, Texas.
 {¶ 40} Various officers of the Elyria Police Department testified as to the procedure for obtaining the marijuana and cocaine for the controlled sale and the packing of the black duffel bag which was placed inside Faulstich's vehicle. Sergeant John Homoki stated that after Defendant was arrested, the black bag was found hidden inside a cardboard box in the back of Defendant's van. Michael Velten, a forensic scientist, was responsible for testing the materials placed inside the duffel bag. At trial, he stated that the test results indicated the presence of marijuana and cocaine.
 {¶ 41} Additionally, Detective Jim Widmer testified for the State. He asserted that as an undercover agent he researches current street values of illegal drugs in order to conduct controlled buys and sales. Detective Widmer explained that one pound of marijuana could be purchased for $700 to $1,500 in Ohio. He indicated that one kilo of cocaine costs roughly $25,000 to $28,000. Detective Widmer stated that middlemen were able to purchase these items at lower prices without the "export prices" and "markup."
 {¶ 42} Jan Hudach ("Hudach"), a previous employer of Defendant, testified that Duncan-Lakkes was a landscaping company that also had a showroom. She stated that the business also sold other outdoor items and furnishings, such as patio sets, light posts, and mailboxes. Hudach maintained that Defendant possessed a small number of antique cabinets but did not sell them on a regular basis. She recalled that cabinets were not included in the Duncan-Lakkes catalog.
 {¶ 43} Defendant also testified at trial and presented his version of the events. At the outset, Defendant established that he is self-employed and owns a landscaping business. The business performs landscaping functions and also sells flagstone, topsoil, mulch, lampposts, benches, patio furniture, mailboxes, and marble statues. Defendant asserted that he also painted and restored antique cabinets and would sell them at his business. He indicated that every item sold was not listed in the catalog; only consistent itmes were represented in the Duncan-Lakkes purchasing catalog. Defendant maintained that he purchased various cast aluminum items from Mexico that he would sell at Duncan-Lakkes. He testified that the merchandise would be delivered from Mexico to El Paso, Texas and then he would be responsible for transporting the items to Ohio.
 {¶ 44} Defendant testified that while visiting Faulstich in her El Paso home, he became interested in her antique cabinet. He requested that Faulstich purchase some of the cabinets from Mexico for him. Defendant asserted that in the beginning of March, 2000, Faulstich began selling cabinets, mailboxes, and aluminum for his business. Defendant maintained that he supplied Faulstich with $10,000, in May of 2000, to purchase cabinets and aluminum for him. He testified that this was not a loan and that he never agreed to receive $10,000 plus $5,000 in interest or a supply of marijuana in return.
 {¶ 45} Defendant asserted that he met with Faulstich at a restaurant in July of 2000 to inquire as to why he had not yet received his merchandise. Defendant stated that he was supposed to receive the 30 cabinets in May of that same year. At their meeting, Defendant recalled explaining to Faulstich that he wanted the aluminum and some of the cabinets and also discussed the possibility of refunding his money. He stated that the most expensive cabinet was valued at $300 and the most expensive mailbox was $550. Defendant testified that the terms "cabinet" and "mailbox" had their ordinary meanings. Additionally, Defendant indicated that he used the words "key" and "kilo" frequently because the aluminum mailboxes were sold in "keys." He also stated that his references to "green" and "white" concerned the colors of the cabinets.
 {¶ 46} When asked why he mentioned the possibility of a "chop shop" operation on his warehouse premises, throughout his dealings with Faulstich, Defendant responded that it was merely a sales pitch. He maintained that Faulstich was looking for a piece of property with a "cover area" and felt that this information would be a good sales tactic. Defendant admitted however, that although he had no evidence of a "chop shop" on the premises, one was operating there for seven or eight years. He stated that he was not the operator of the business. Defendant explained that he originally purchased the property to use it as a "cardboard transfer station." Defendant indicated that he was in the process of organizing a landfill in Trumbull, Ohio, and planned on loading cardboard onto railroad cars adjacent to the property and then shipping it to Mexico.
 {¶ 47} Defendant testified that he would sell this warehouse property at any time and felt he could make a profit on it. He recalled purchasing the real estate for $75,000 and asserted that he was looking to sell it for approximately $150,000 or $175,000. When Defendant was asked why he was willing to trade the property for 30 cabinets, valued at $300 each, and 5 mailboxes, valued at $550 a piece, or 15 kilos of aluminum, valued at $.76 a kilo, he responded that he has "given a lot of gifts in [his] life."
 {¶ 48} Defendant also admitted to discussing with Faulstich the "great setup" he had at the warehouse because it had "good cover." However, Defendant was unable to explain why he would have reason to hide a legitimate mailbox and cabinet restoration operation. Defendant was also unable to explain why he "possibly" would have inquired as to "[h]ow long [was] it going to be before [they] get any more weed" since he allegedly was unaware that the term "weed" was slang for marijuana.
 {¶ 49} Defendant testified that he pled guilty to possession of drugs in 1995. He stated that he was unaware of the current possession charges until he was taken to jail. Defendant explained that although he removed the black duffel bag from Faulstich's vehicle and placed it in his van, he had no knowledge that it contained marijuana or cocaine. He asserted the bag was closed and he thought that Faulstich was "just giving [him] something." Defendant did not recall asking if "[b]oth things [were] together" and Faulstich's response that "the white is on the side and the green is in there[.]" However, he was unable to deny that the conversation took place. Defendant acknowledged that white and green mailboxes would not fit inside the black duffel bag.
 {¶ 50} After careful review of the record, we are unable to conclude that the trier of fact lost its way and created a manifest miscarriage of justice when convicting Defendant of possession of drugs. Although conflicting testimony was presented, we refrain from overturning the verdict because the jury chose to believe other testimony. "[W]hen conflicting evidence is presented at trial, a conviction is not against the manifest weight of the evidence simply because the [trier of fact] believed the prosecution testimony." State v. Gilliam (Aug. 12, 1998), 9th Dist. No. 97CA006757, at 4. Accordingly, Defendant's convictions were not against the manifest weight of the evidence. Defendant's sixth assignment of error is overruled.
 CROSS-ASSIGNMENT OF ERROR "The trial court's ruling *** denying forfeiture based upon said forfeiture constituting an excessive fine was against the manifest weight of the evidence presented under the proportionality review standard."
 {¶ 51} In their sole cross-assignment of error, the State challenges the court's ruling that forfeiture of Defendant's property would constitute an excessive fine. More specifically, the State asserts that the court's factual findings are inconsistent with a finding that forfeiture would constitute an excessive fine. We agree.
 {¶ 52} Initially, we note that Defendant challenges this Court's jurisdiction to entertain the State's cross-assignment of error. Defendant maintains that the State was required to seek leave to appeal, pursuant to R.C. 2945.67(A). However, R.C. 2945.67(A) provides the State with an appeal as a matter of right when "any decision of a trial court in a criminal case *** grants a motion to dismiss all or any part of an indictment[.]" In the instant case, the trial court's denial of the forfeiture specification of the indictment essentially constituted a dismissal of part of the criminal indictment. Thus, the State was not required to seek leave to appeal the denial of forfeiture in this instance.
 {¶ 53} 2925.42(A)(1)(b) provides for the forfeiture of property if "[t]he property was used or intended to be used in any manner to commit, or to facilitate the commission of, the felony drug abuse offense or act." Forfeiture is a form of punishment for a specified offense and thus constitutes a fine for purposes of Section 9, Article 1 of the Ohio Constitution and the Eight Amendment to the United States Constitution.State v. Harold (1996), 109 Ohio App.3d 87, 90-91, citing State v. Hill
(1994), 70 Ohio St.3d 25, syllabus. As these provisions prevent the government from imposing an excessive fine upon an individual, the trial court is to determine whether the forfeiture of property would constitute such a prohibited fine prior to entering an order of forfeiture. Harold,109 Ohio App.3d at 91, citing Hill, 70 Ohio St.3d 25 at syllabus.
 {¶ 54} In order to discern whether forfeiture constitutes an excessive fine, a proportionality review is to be conducted. Harold,109 Ohio App.3d at 94. This review compares the harshness of the forfeiture to: 1) the culpability of the defendant; 2) the gravity of the offense; 3) the relationship of the property to the offense; and 4) the harm to the community. Id. at 93. Additional factors to consider when determining the harshness of the forfeiture are the fair market value of the property, the intangible and subjective value of the property, and the hardship to the defendant, including the effect of forfeiture on the defendant's family and financial condition. Id. The court should also evaluate the harm caused by the illegal activity and whether the defendant was directly involved in the illegal activity, the amount of drugs involved and their value, the duration of the illegal activity, and its effect on the community. Id. at 93-94. We note that "[n]o one factor has greater value than any other." Id. at 92. Furthermore, each factor is to be evaluated on a case-by-case basis. Id. Ultimately, the trial court is to determine whether the factors, as applied to the totality of the circumstances, render the forfeiture an excessive fine. Id.
 {¶ 55} An appellate court is to give deference to the trial court's factual findings. State v. Ziepfel (1995), 107 Ohio App.3d 646,652. However, constitutional analyses are questions of law, therefore an appellate court applies a de novo standard of review and no deference is afforded to the trial court's conclusions. Id.
 {¶ 56} In the present case, the State contests the court's conclusion that forfeiture would constitute an excessive fine. In its judgment entry the trial court stated that there was uncontested evidence that the drug transaction consummated in the parking lot of the subject property and found that "it [was] more probable than not that the property in question was intended to be used in the commission of drug possession." However, the court then asserted that there was a "disparity linking [Defendant's] crime and the property."
 {¶ 57} When considering the harshness of forfeiture, the court found that Defendant received a total of twelve years of incarceration and was ordered to pay a $30,000 fine. The court concluded that Defendant's crimes were grave in nature. The court also recognized that Defendant was not an innocent owner as "[a]ll evidence points to the fact that it was [Defendant] who first suggested trading the property for drugs." When evaluating the value of the property, the court noted that there was no evidence presented pertaining to intangible value and explained that such value would be highly unlikely due to the nature of the property in question. The court determined that forfeiture would effectively amount to an additional $250,000 fine as Defendant estimated the property value to be $150,000 and its contents worth an additional $100,000. However, we note that the initial fine of $30,000 has no bearing on the proportionality analysis to be performed by the court.
 {¶ 58} The court also considered Defendant's age at the time of his release from prison, and determined that at age 71 a convicted felon would have little prospect of finding meaningful employment. Based on this fact, the court concluded that the loss of the property would constitute a significant hardship to Defendant. Lastly, the court found that 4,994 grams of cocaine were involved and noted that immediately prior to his arrest, Defendant was "displaying" the property to Faulstich, the individual whom he believed would ultimately broker the deal. Although a conclusion as to the impact on the community was not expressly stated, the court recognized that Defendant was "contemplating some future transaction where the property would be traded for drugs."
 {¶ 59} Upon review of the record, we conclude that the court erred in its analysis of the applicable proportionality factors because the court's conclusion that forfeiture would constitute an excessive fine is contradictory to its factual findings. Accordingly, the State's cross-assignment of error is sustained. The matter is remanded for further proceedings consistent with this opinion.
 {¶ 60} Defendant's assignments of error are overruled. The State's cross-assignment of error is sustained. The judgment of the Lorain County Court of Common Pleas is affirmed in part, reversed in part and remanded for proceedings consistent with this opinion.
BAIRD, J. and WHITMORE, J. CONCUR.