OPINION
{¶ 1} Defendant-appellant, Cory A. Colvin, was indicted by the Franklin County Grand Jury on one count of attempted murder, in violation of R.C. 2923.02, one count of felonious assault, in violation of R.C.2903.11, and two counts of having a weapon while under disability, in violation of R.C. 2923.13. The attempted murder and felonious assault counts included firearm and drive-by shooting specifications. All of the counts were related to the non-fatal shooting of Mecca Givens ("Givens") on October 4, 2001. Appellant was indicted along with a co-defendant, Kambon Tiafa Kali ("Kali").
 {¶ 2} The attempted murder and felonious assault counts have been tried to a jury three times. Appellant waived a jury trial relative to the count of having a weapon while under disability.
 {¶ 3} During the first trial, Kali accepted a plea bargain after hearing the testimony of Givens. Kali then testified against appellant as required pursuant to the terms of his plea agreement. Because the jury was unable to reach a unanimous verdict, the trial court declared a mistrial. Near the end of the second trial, the trial court declared a mistrial after defense counsel made an inappropriate comment to the jury during closing arguments indicating that the prosecutor was unable to convince the first jury of appellant's guilt. A third jury found appellant guilty of the principal counts and specifications, and the trial judge found appellant guilty of the weapons count.
 {¶ 4} Plaintiff-appellee, State of Ohio, elected to have appellant sentenced on the attempted murder count, and the trial court imposed an aggregate 14-year prison term, consisting of six years for the attempted murder, consecutive three and five-year prison terms for the firearm and drive-by shooting specifications, and a concurrent one-year prison term for the count of having a weapon while under disability.
 {¶ 5} Appellant timely filed a notice of appeal, wherein he asserts the following six assignments of error:
Assignment of Error No. 1:
The trial court's sua sponte declaration of a mistrial and denial of Defendant-Appellant's subsequent motion to dismiss on double jeopardy grounds violated his rights under U.S. Const. Amend. V and XIV and Ohio Const. art. 1 § 10 to not be twice put in jeopardy for the same offense. Defense counsel's closing remarks to the second jury to the effect that the prosecution was unable to convince the first jury of her client's guilt did not create a manifest necessity to abort the second trial.
Assignment of Error No. 2:
Defendant-Appellant's convictions for attempted murder with specifications (as well as the guilty verdict for felonious assault with specifications that was merged with the attempted murder conviction) and having a weapon under disability are not supported by evidence sufficient to satisfy the requirements of due process under U.S. Const. amend. V andXIV; or, alternatively, are against the manifest weight of the evidence.
Assignment of Error No. 3:
The trial court's submission of an incomplete set of written instructions to the jury and its subsequent failure to follow the proper procedures for responding to the jury's request for additional instructions contravened Crim.R. 22, Crim. R. 43(A) and R.C. 2945.10(G), violated Defendant-Appellant's right to be present during jury re-instruction, his right to counsel, and his right to due process and a fundamentally fair jury trial under U.S. Const. amend. V, VI and XIV and Ohio Const. art. 1, §§ 5, 10 and 16, and constituted structural error or, alternatively, prejudicial error.
Assignment of Error No. 4:
The following erroneous evidentiary rulings and overreaching by the prosecutors, separately and/or in combination, unfairly and prejudicially tipped the credibility balance squarely in favor of the State and violated Defendant-Appellant's right of confrontation and cross-examination and right to due process and a fundamentally jury fair trial under U.S. Const. amend. V, VI and XIV and Ohio Const. Art. 1 §§ 10
and 16: (a) the admission of unreliable hearsay testimony that was directed to establishing a motive for the State's theory of why Defendant-Appellant would shoot the victim, (b) the exclusion of extrinsic evidence of the cooperating codefendant's bias and motive to lie, and (c) the prosecutors' improper use of the enforcement clause of the codefendant's unredacted cooperation agreement to bolster his credibility.
Assignment of Error No. 5:
The trial court's decision to sentence Defendant-Appellant to a six year prison term for attempted murder was contrary to law and violated his right to presentment to a grand jury, his right to trial by jury, and his right to due process under U.S. Const. Amend. V, VI and XIV and Ohio Const. Art. 1, §§ 5, 10 and 16 due to the following procedural defects: (a) the omission of an allegation in the indictment as to any of the additional facts required by R.C. 2929.14(B) for the imposition of a prison term in excess of the shortest prison term of three years for a first degree felony and (b) the lack of a jury finding as to the existence of those facts under the beyond a reasonable doubt standard.
Assignment of Error No. 6:
Defendant-appellant was denied his right to the effective assistance of counsel guaranteed to him under U.S. Const. amend. VI and XIV as a result of defense counsel's failure (a) to object to certain errors that are the subject of Assignments of Error Nos. 3, 4 and 5 and/or to take other corrective action to protect their client's rights and (b) to re-call a witness who had given testimony favorable to the defense at the second trial.
 {¶ 6} On October 4, 2001, Givens and other family members were at the home of Givens' sister, Demetria. (Tr. Vol. II, 38-39.) Many people were at Demetria's house following the recent death of Mike Rispress, who was allegedly shot by Demetria's boyfriend. Kali took the death of Rispress very hard and indicated that he wanted to do something to the people who had killed his friend. After spending a considerable amount of time with appellant drinking, the two men drove around in Kali's white Lincoln looking for the people responsible for Rispress' death.
 {¶ 7} Later, Givens took her nephew, Marcus Stoumile, to her apartment. Givens' cousin, Earnest Felder, also went with them.
 {¶ 8} Felder and Givens were sitting on the front steps of Givens' apartment when they saw Kali and appellant drive down the alley near Givens' home. The windows of the car were down, and both Felder and Givens were able to see the occupants, whom they both knew from the neighborhood.
 {¶ 9} At approximately 8 p.m., Givens and Stoumile were leaving her apartment. Givens saw Kali's car coming down the street with the passenger side toward her apartment. Both Givens and Stoumile saw appellant inside the car in the passenger seat. Givens testified at trial that she called out to appellant, "what's up [?]" (Tr. Vol. II, at 145.) Appellant responded, "[w]hat you mean what's up, I'll show you what's up, bitch." Id. Thereafter, Givens testified that appellant raised a gun and began shooting. Givens was shot above her left eye, and as a result lost sight in her left eye and has six metal plates in her head. The bullet is still lodged in her skull. As such, the police were not able to identify the gun with which Givens was shot.
 {¶ 10} Felder testified that he left Givens' home because he feared for his safety. However, when he heard gunshots, Felder drove back to Givens' apartment. Felder saw Givens lying on the ground with a bullet wound in her forehead.
 {¶ 11} Columbus Police Officer, Howard Pettengill, was the first officer to respond to the scene. He observed Givens lying face-up with a bullet wound between her eyes. Givens was conscious, and when Officer Pettengill asked her if she knew who had shot her, Givens responded, "Cory and Taifa [Kali]." (Tr. Vol. II, at 9.) Officer Mark Johnson arrived at the scene later, and Givens also gave him Kali's name. Based upon the description of the car, the police located Kali's car behind 408 Stoddard Avenue. The hood of the vehicle was still hot. Felder later identified the car as belonging to Kali.
 {¶ 12} Police collected spent shell casings from a .40-millimeter and a .9-millimeter gun from the scene. However, because the bullet is still lodged in Givens' head, there is no evidence as to which caliber gun injured Givens. The police were not able to recover any of appellant's fingerprints from the inside of the vehicle.
 {¶ 13} Kali testified that he had known appellant since high school and that he knew both Givens and Felder from the neighborhood. According to Kali's testimony, he understood that some "guys" from Detroit were responsible for the death of Mike Rispress and that one of them was living with Givens. A friend, Dontay Daniels ("Daniels"), agreed to show Kali where Givens lived, and the two drove past her apartment in Kali's car. According to Kali's testimony, appellant was following behind them in his Ford Taurus. Later that day, Daniels was beaten up. Kali and appellant ended up drinking at a bar until Kali went to his friend "Tomica's" house. Thereafter, Kali and appellant got back together again and with guns (appellant had a .9 millimeter and Kali had a .40 millimeter), the two drove by Givens' apartment again. Kali testified that he saw a guy outside Givens' apartment as they drove by. Kali heard appellant yell, "bitch," and then heard two shots. As he turned, Kali saw appellant leaning out of the window with the gun in his right hand. Kali testified that he stopped his car, stood up through the sunroof and fired his gun.
 {¶ 14} Two witnesses testified for the defense. Both of them testified that appellant was with them at a local bar called the "Green Room" all evening.
 {¶ 15} In his first assignment of error, appellant asserts that the trial court improperly granted a mistrial at the end of the second trial. Appellant contends that the remarks made by defense counsel during closing arguments did not create a manifest necessity for ordering a mistrial.
 {¶ 16} It is undisputed that jeopardy had attached in this case because the second jury had already been impaneled and sworn and all of the evidence had been presented. Crist v. Bretz (1977), 437 U.S. 28,98 S.Ct. 2156. The question presented is whether appellant was protected from retrial by the constitutional prohibition against double jeopardy.
 {¶ 17} In Arizona v. Washington (1978), 434 U.S. 497, 98 S.Ct. 824, the United States Supreme Court stated:
A State may not put a defendant in jeopardy twice for the same offense. Benton v. Maryland, 395 U.S. 784, 89 S.Ct. 2056 * * *. The constitutional protection against double jeopardy unequivocally prohibits a second trial following an acquittal. * * *
Because jeopardy attaches before the judgment becomes final, the constitutional protection also embraces the defendant's "valued right to have his trial completed by a particular tribunal." [Fn. 11 cites UnitedStates v. Jorn (1971), 400 U.S. 470, 484, 91 S.Ct. 547.] The reasons why this "valued right" merits constitutional protection are worthy of repetition. Even if the first trial is not completed, a second prosecution may be grossly unfair. It increases the financial and emotional burden on the accused, prolongs the period in which he is stigmatized by an unresolved accusation of wrongdoing, and may even enhance the risk that an innocent defendant may be convicted. The danger of such unfairness to the defendant exists whenever a trial is aborted before it is completed. Consequently, as a general rule, the prosecutor is entitled to one, and only one, opportunity to require an accused to stand trial.
Unlike the situation in which the trial has ended in an acquittal or conviction, retrial is not automatically barred when a criminal proceeding is terminated without finally resolving the merits of the charges against the accused. Because of the variety of circumstances that may make it necessary to discharge a jury before a trial is concluded, and because those circumstances do not invariably create unfairness to the accused, his valued right to have the trial concluded by a particular tribunal is sometimes subordinate to the public interest in affording the prosecutor one full and fair opportunity to present his evidence to an impartial jury. Yet in view of the importance of the right, and the fact that it is frustrated by any mistrial, the prosecutor must shoulder the burden of justifying the mistrial if he is to avoid the double jeopardy bar. His burden is a heavy one. The prosecutor must demonstrate "manifest necessity" for any mistrial declared over the objection of the defendant.
Id. at 503-505 (fns. 12-15 omitted).
 {¶ 18} As Justice Black stated in the United States Supreme Court case in Wade v. Hunter (1949), 336 U.S. 684, 69 S.Ct. 834:
* * * What has been said is enough to show that a defendant's valued right to have his trial completed by a particular tribunal must in some cases be subordinated to the public's interest in fair trials designed to end in just judgments.
Justice Black went on to state, as follows:
When justice requires that a particular trial be discontinued is a question that should be decided by persons conversant with factors relevant to the determination. The guiding rule of federal courts for determining when trials should be discontinued was outlined by this Court in United States v. Perez, 9 Wheat. 579[.] * * * [T]his Court said, 9 Wheat. at page 580:
"* * * We think, that in all cases of this nature, the law has invested Courts of justice with the authority to discharge a jury from giving any verdict whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere. * * *"
Id. at 689-690.
 {¶ 19} In Arizona v. Washington, supra, the court noted that the term "manifest necessity" cannot be applied mechanically or without attention to the particular problem confronting the trial court. The court noted that "it is manifest that the key word `necessity' cannot be interpreted literally; instead, contrary to the teaching of Webster, we assume that there are degrees of necessity and we require a `high degree' before concluding that a mistrial is appropriate." Id. at 506. The court went on to note that the question of whether that "high degree" has been reached is more easy to answer in some kinds of cases than in others. The court noted that the strictest scrutiny is appropriate when the basis for the mistrial is the unavailability of critical prosecution evidence, or whether there is reason to believe that the prosecutor is using the superior resources of the state to harass or to achieve a tactical advantage over the accused. However, at the other end of the spectrum, a mistrial premised upon the trial judge's belief that the jury is unable to reach a verdict is appropriate and requires the defendant to submit to a second trial. This rule recognizes society's interest in providing the prosecution with one complete opportunity to convict those who have violated its laws.
 {¶ 20} The court went on to state that the trial judge's decision should be accorded certain deference because the trial judge is most familiar with the evidence and the background of the case on trial; and the trial judge has listened to the arguments and has observed the apparent reaction of the jurors. Id. at 514.
 {¶ 21} In the present case, prior to the presentation of evidence, the trial judge, the prosecution, and defense counsel discussed, at length, how to properly address the fact that the witnesses who would be testifying in the second trial had been previously called to testify in the first trial. It was agreed that it would be improper to mention that the jury in the first trial had been unable to reach a verdict. As such, it was determined that counsel could refer, on examination of witnesses, to their prior testimony without referencing the fact that the first jury was not able to reach a verdict. The trial proceeded, and witnesses were called, examined and cross-examined, without any improper references to the first trial. However, during closing arguments, defense counsel made the following relevant statements:
* * * Reality is the State cannot prove this case beyond a reasonable doubt. The State cannot prove his case beyond a reasonable doubt. They don't have it. It's not there. Tried before. They couldn't convince the jury then and they can't do it now.
(Tr. Vol. III, at 105-106.)
 {¶ 22} The prosecuting attorney immediately objected to the statements of defense counsel, and the following proceedings occurred outside the presence of the jury:
THE COURT: What are you doing?
[DEFENSE COUNSEL]: I apologize, Your Honor.
THE COURT: Couldn't convince them then. What the hell do you think that kind of impression is going to leave with this jury? We talked about this ahead of time that we were not going to talk about the fact that it was a hung jury the last time. What the heck do you think you've just told these people?
[DEFENSE CO-COUNSEL]: I don't think she told the jury it was a hung jury, Your Honor.
THE COURT: Couldn't reach a verdict the last time. Read it.
Thereupon, the last statement was read by the Court Reporter.
[DEFENSE CO-COUNSEL]: Didn't say the jury was hung, Judge.
[DEFENSE COUNSEL]: I apologize.
THE COURT: What the heck? How could you interpret that other than that? They couldn't convince them the last time.
[DEFENSE CO-COUNSEL]: I don't know, Your Honor.
THE COURT: Then why are we here a second time. They're going to go back and speculate that we didn't do it the last time. Well gee whiz. * * *
[PROSECUTOR]: It's so incredibly prejudiced, the fairness of this case. I cannot even —
THE COURT: I can't believe this.
[PROSECUTOR]: — express. This is why I addressed this well before we did voir dire, so this would not be a part of anything because I did not want to taint this and have a third trial on this case. I'm not sure what kind of curative instruction you can give.
THE COURT: Without telling what the heck happened the last time. How in the heck do I cure it by just saying oh, just don't pay any attention to that? It's already done. It's already said. In order to explain to them or to make any sense out of any curative instruction I've got to tell them what the hell happened the last time so that we can understand how this curative instruction makes any sense. I don't know about you, I can't see it.
[DEFENSE CO-COUNSEL]: If I could, Your Honor, the jury already knows that there was a previous trial in this case.
THE COURT: Right.
[DEFENSE CO-COUNSEL]: I think instructing — providing a curative instruction to the jury that they're not to consider the outcome of any other proceedings in reaching a verdict in this case would be appropriate.
THE COURT: I don't think that solves it. What do you think?
[PROSECUTOR]: No. I think that that's the bare minimum. You can't tell her that she was mistaken because she's not and that would be prejudiced to the defense in putting some kind of impunity on that.
THE COURT: I'm taking the jury out.
(Tr. Vol. III, at 106-108.) Thereupon, the following proceedings were held outside the presence and hearing of the jury:
THE COURT: I don't frankly think there's any way to fix it. what do you think?
[PROSECUTOR]: Well, my desire is to try and carve out some way to fix it, but at this moment it escapes me as to how we can give an instruction that would unring the bell in a manner that would then not be prejudicial to the defense because you can't disparage [defense counsel] for making the statement or somehow imply that her statement was wrong without hurting the fairness to their side. And I think at this point now they knew, I agree with [defense co-counsel] in saying that they were aware that there was prior testimony or at best a trial. They can probably very logically conclude that there was a prior trial because the numbers of witnesses have said yeah, I testified before.
But to say that at this point couldn't convince the jury last time, I don't think that those 12 people individually or as a group are going to be able to say well, you know, didn't reach a decision, they hung.
THE COURT: We can't either.
[PROSECUTOR]: Or we'll give you the option of saying we don't have to, we have an easy out because that's what happened the last time as well as being something we had said earlier we were not going to talk about and it comes up at the worst possible moment.
[DEFENSE CO-COUNSEL]: Your Honor, if I could just briefly. As we understood the Court's ruling prior to trial and we're certainly cognizant of that, the Court's ruling was we were not to instruct the jury there was a hung jury or that they were somehow bound by the decisions of any previous proceedings. The defense did not say that. [Defense counsel] did not say that in her closing remarks. And simply put, there's not — there's no need to unring the bell. To the extent that there might be any confusion on the part of the jury at this point, a curative instruction which is the preferred remedy as I understand it for the Court of Appeals in any situation where there's confusion to the jury, a curative instruction would be the appropriate remedy at this point.
The jury can be instructed that they are not to be bound by the outcome of any prior proceedings. That doesn't tell the jury there was a conviction, a mistrial, or an acquittal. It doesn't tell them anything about the previous proceedings. We have not told them what the jury verdict was or was not in a previous proceeding. And what they heard was what they already knew which was there was a prior trial because we've been talking about it for three days, Your Honor.
So a curative instruction, we submit, would be the appropriate remedy. We certainly did not intentionally violate any orders of this Court. [DEFENSE COUNSEL], I know, did not do that. And a curative instruction will cure any potential confusions the Court is concerned about, Judge.
THE COURT: Well, you know, whether it was intentional or not — I don't believe it was intentional, but it's kind of a deal if I drive my car down the street and I hit another car, whether it's an accident or I do it on purpose, the effect is we've got a bunged [sic] up car. And what we have right how is a screwed up case. What else do you want to say, [Prosecutor]?
[PROSECUTOR]: I don't disagree with [defense co-counsel] in the fact that the jury can easily conclude that there was another trial. I don't think that hurts either side of the fairness of the trial. But I do not — I cannot disagree stronger that this jury can make any conclusion other than the jury hung last time. We've talked repeatedly since voir dire. The State has, the defense has. And State having to meet a burden of proof, the State having to prove everything. We had to prove all those elements.
She suggested we didn't do it last time and here we are now. I don't think there's any group of people that you can pick as 12 or somebody not going to make that conclusion. So I think that that's what I understand making that position as an argument. I think the logic of that escapes me.
[DEFENSE CO-COUNSEL]: If I could, Your Honor, the reason it's not just an argument, it's a good judgment argument. This jury know that they're the second jury on this case. We didn't add anything to the body of knowledge. It was just it's [sic] argument, it's [sic] argument that we understood and certainly [Defense Counsel] understood to be within the confines of this Court's order.
[THE COURT]: No, it isn't within the confines of the Court. Yes, we did agree that we could talk about the fact that there was a prior case. We all agreed that. No, we never got to the point of saying they couldn't do it the last time and you may have trouble, too. No. That was not a part of the original agreement. And you can argue till the cows come home, but that is not a part of the original agreement.
No one ever disputed the fact that you could talk about there being a prior case. We have talked about it ad nauseam in here that there was a prior case and they testified before and how they testified and looking at the transcripts and all that. That has nothing to do with the issue here.
What the issue is here is the fact that there's [sic] the jury is aware now that the last time they couldn't handle the evidence and couldn't come back with a verdict and by God here we are again. That's exactly the impression I have and I'm sure [the prosecutor] is going to — is on the same page.
[PROSECUTOR]: Absolutely, Your Honor.
[DEFENSE CO-COUNSEL]: Judge, with all due respect, that jury already thinks that. They know they're the second jury in this case, Judge.
THE COURT: They don't know why.
[PROSECUTOR]: And there are —
[DEFENSE CO-COUNSEL]: Precisely.
[PROSECUTOR]: — a number of reasons why there's a second trial.
THE COURT: There could have been a mistrial the last time. It very easily could have been a mistrial. Could have been something that we couldn't get beyond. It could have been a mistrial, in addition to being a hung jury. There could be a variety of reasons why this thing didn't go. But the fact that they couldn't' reach a verdict the last time, there's only one way to go with that and that is well gee whiz, we can't do it either.
I declare a mistrial. I'll tell the jury.
(Tr. Vol. III, at 109-114.)
 {¶ 23} In the present case, defense counsel up-ended the level playing field by stating that the state could not prove its case to this jury, just as the state was unable to prove its case with the previous jury. Clearly, the comment was improper. Furthermore, the comment was prejudicial to the state and its case. As such, the trial court was left to determine whether or not a remedy could be fashioned which would remove that prejudice or not.
 {¶ 24} Appellant urges this court to apply the rationale espoused by the Sixth Circuit Court of Appeals in Johnson v. Karnes (C.A.6, 1999),198 F.3d 589. However, while instructive, decisions from the Sixth Circuit are not binding on this court. In Johnson, as in the present case, defense counsel made an improper statement during cross-examination of the victim, and the prosecuting attorney objected. The trial judge allowed a brief recess and then held a side-bar conference with defense counsel and the prosecuting attorney. The trial judge stated that the question was impermissible and, in his opinion, the situation could not be cured. The judge told the prosecuting attorney that if he wanted a mistrial, the trial judge would grant it. The prosecuting attorney then asked for a mistrial, and the trial judge granted it.
 {¶ 25} The defendant filed a motion to dismiss on double jeopardy grounds, and the trial judge denied the motion. Thereafter, the defendant filed a habeas petition with the Sixth Circuit.
 {¶ 26} In determining that the trial court was incorrect in granting the mistrial, the court noted that the trial court had pressured the prosecutor to decide whether he wanted a mistrial; the court granted only a very brief recess; the court did not seriously consider other alternatives to a mistrial; and the court's attitude was to punish the wrongdoer. As such, the court in Johnson determined that the trial judge had failed to exercise sound discretion in declaring a mistrial.
 {¶ 27} In his dissenting opinion, Judge Boggs noted that the primary case cited by the court to support its decision, Harpster v. Ohio
(C.A.6, 1997), 128 F.3d 322, had been premised on defense actions which allegedly justified the mistrial that were either not erroneous at all, or, if any prejudice resulted, that prejudice was miniscule. Judge Boggs indicated that the case was more analogous to Arizona v. Washington,
where the United States Supreme Court upheld a mistrial granted because of comments made by a defense attorney in opening statements that introduced impermissible material. The court did so, even though the trial court had not made an explicit finding of "manifest necessity."
 {¶ 28} In reviewing the record in the present case, this court finds that the trial judge in the instant matter did not abuse her discretion in granting a mistrial. The statement by defense counsel was improper, and it violated the prior agreement entered into between the court and counsel. Second, the comment was prejudicial to the state. Third, the trial judge did consider other alternatives. The prosecuting attorney was not able to verbalize an appropriate potential instruction, and the trial judge did not agree with the statements made by defense counsel that the prejudicial effect of defense counsel's statement could be removed. Again, as Justice Black had stated, a defendant's right to have his trial completed by a particular tribunal must in some cases be subordinated to the public's interest in fair trials designed to end in just judgments. Upon review, this court finds that the granting of a mistrial was appropriate and that, with the exception of the count of having a weapon while under disability, which was tried to the court and not the jury, subsequent prosecution of all the remaining counts were properly retried in the third trial. As such, with the very limited exception above-noted relative to the charge of having a weapon while under disability, appellant's first assignment of error is sustained in part and overruled in part.
 {¶ 29} In his second assignment of error, appellant argues that his convictions are not supported by sufficient evidence and that they are against the manifest weight of the evidence. For the following reasons, this court disagrees.
 {¶ 30} The test for reviewing the sufficiency of the evidence was set forth in State v. Jenks (1991), 61 Ohio St.3d 259, at paragraph two of the syllabus:
An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.
 {¶ 31} The standard for determining whether a judgment in a criminal case is against the manifest weight of the evidence has been set forth by the Supreme Court of Ohio in State v. DeHass (1967), 10 Ohio St. 2d 230, paragraph two of the syllabus, which states:
On the trial of a case, either civil or criminal the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts.
 {¶ 32} The test for whether the judgment is against the manifest weight of the evidence is broader than the test for whether there is sufficient evidence to support a conviction. In considering the manifest weight of the evidence, the reviewing court weighs the evidence in a limited sense to determine whether there is sufficient, competent, credible evidence to permit reasonable minds to find the defendant guilty beyond a reasonable doubt. The syllabus rule of Jenks, which applies only to a review of the sufficiency of the evidence, requires that the evidence be viewed in a light most favorable to the state. By comparison, a review of the manifest weight of the evidence does not require that the evidence be so viewed, but the ultimate test remains whether the result could reasonably be reached from the evidence. Under both standards, an appellate court must ordinarily defer to the fact finder's resolution of factual and credibility issues. DeHass, supra.
 {¶ 33} Viewing the sufficiency question, this court concludes that the evidence was sufficient. Viewing the evidence in a light most favorable to the prosecution, Givens testified that appellant called her a "bitch," and she saw him lean out of the car. Furthermore, Stoumile testified that appellant was in the passenger seat and it was that side of the car that was closest to Givens' apartment. As such, this court finds that the evidence was sufficient to support the convictions.
 {¶ 34} Turning to the manifest weight issue, this court cannot find that the trial court's determination was against the manifest weight of the evidence. Appellant argues that the state's witnesses gave inconsistent accounts of the shooting. However, after reviewing the record, this court notes that defense counsel was able to cross-examine the state's witnesses and brought the inconsistencies to the jury's attention. The jury was free to believe all, part, or none of the testimony of each witness. The testimony of the victim, Givens, standing alone would have been sufficient to support a conviction. Upon review, this court cannot find that the jury lost its way, and we conclude that the judgment was not against the manifest weight of the evidence. Defendant's second assignment of error is not well-taken and is overruled.
 {¶ 35} In his third assignment of error, appellant contends that the trial court erred by submitting an incomplete set of written instructions to the jury and that the trial court further erred by subsequently failing to follow proper procedures for responding to the jury's request for additional instructions. Specifically, the court orally gave the jury certain instructions before the case began. Those instructions explained trial procedure, stipulations, the role of the attorneys, objections, both direct and circumstantial evidence, how to determine issues of credibility, note-taking, and confidentiality. These same instructions were orally repeated to the jury at the close of the evidence. At the close of the evidence, the trial court further instructed the jury relative to the various counts with which appellant was charged and provided those instructions to the jury in written form as well.
 {¶ 36} At some point during deliberation, the jury sent the following written question to the judge, which is contained in the record but was not made part of the transcript: "Can we get instructions on how to judge the credibility of a witness?"
 {¶ 37} Because the court's response to the jury's question was not in the transcript, the state filed a motion requesting that it be permitted to supplement the record with the August 13, 2004 decision and judgment entry from the trial court granting the prosecution's motion to correct the record. This court granted the motion. In that entry, Judge Miller noted, as follows:
It is the custom of this Court to read the credibility instruction to the jury both prior to the commencement of the trial, and again, following final arguments as part of the general charge to the jury. Further, it is the custom of this Court to send back to the jury the instructions specifically related to the felony or felonies with which the defendant is charged. Therefore, the jury in Colvin's case would have received specific instructions related to felonious assault with a specification and attempted murder with a specification. The weapon under disability charge was tried to the Court.
During the course of deliberations, the jury sent out a question asking for the credibility instruction. All counsel were called to chambers, appeared, and decided, along with the Court, that the credibility instruction should be copied and sent in to the deliberating jury. The Court failed to put the question on the record by reading same to the court reporter but gave the question to the court reporter for inclusion on the record. Having a consensus from counsel that a copy of the credibility instruction should be provided to the jury, which it was, the credibility instruction was then subsequently included in the record along with the particularized instructions relating to the felonies with which Colvin was charged.
Thereafter, the following written charge was given to the jury in response:
The involvement of a witness in the alleged offense may affect the witness' credibility and make the witness' testimony subject to grave suspicion, and requires that it be weighed with great caution.
It is for you, as jurors, in the light of all of the facts presented to you from the witness stand, to evaluate such testimony and to determine its quality and worth or its lack of quality and worth.
 {¶ 38} Appellant does not contend that the trial court's entry is not an accurate reflection of the court's response to the jury's question. Nor does appellant contend that defense counsel was not present and did not agree to the method utilized by the trial court. Instead, appellant cites R.C. 2945.10(G), which provides, in pertinent part, as follows:
The court, after the argument is concluded and before proceeding with other business, shall forthwith charge the jury. Such charge shall be reduced to writing by the court if either party requests it before the argument to the jury is commenced. Such charge, or other charge or instruction provided for in this section, when so written and given, shall not be orally qualified, modified, or explained to the jury by the court. * * *
 {¶ 39} Appellant also cites Crim.R. 22 and 43(A), which require that all proceedings shall be recorded in serious offenses and that counsel should be present at every stage of the proceedings.
 {¶ 40} First, appellant contends that, inasmuch as the trial court submitted a portion of the jury instructions to the jury in writing, the trial court was somehow required to reduce all of the jury instructions to writing. However, appellant has not cited any statute or case law which would require the trial court to do so. Second, while R.C. 2945.10(G) provides that, after written instructions are submitted to the jury, the trial court may not orally qualify, modify, or explain them, the trial court did not do so in the present case. Instead, after discussing the issue with counsel, the trial court gave the jury a portion of the original instruction given with regard to witness credibility. Nothing in that instruction qualified, modified, or explained the instruction to the jury.
 {¶ 41} Furthermore, while the trial court did fail to make a record of this portion of the proceedings, appellant has neither shown that he was prejudiced, nor has he shown that counsel was not present. Instead, the entry by Judge Miller indicates that counsel was present and that counsel agreed with how the issue was to be handled. Stated previously, appellant does not challenge any of the statements made by the trial judge in the entry explaining what transpired relative to the jury's question. As such, this court cannot find that appellant was not duly represented by counsel at this stage of the proceedings. As such, based upon the foregoing, appellant's third assignment of error is overruled.
 {¶ 42} In his fourth assignment of error, appellant argues that the trial court erred in some of its evidentiary rulings, that the prosecutor made improper statements, and that separately and/or in combination, these errors unfairly and prejudicially deprived him of his constitutional right to a fundamentally fair trial. For the reasons that follow, this court disagrees.
 {¶ 43} Appellant's first two allegations of error involve testimony of witnesses. It is well-established that the admission or exclusion of relevant evidence rests within the sound discretion of the trial court and that a ruling by the trial court as to the admissibility of evidence will not be disturbed by a reviewing court absent an abuse of discretion. State v. Robb (2000), 88 Ohio St.3d 59. An abuse of discretion connotes more than an error of law; it connotes an unreasonable, arbitrary, or unconscionable attitude on the part of the trial court. A trial court's decision admitting or excluding evidence will not be reversed absent a clear showing of an abuse of discretion and material prejudice to the defendant. State v. Hymore (1967),9 Ohio St.2d 122.
 {¶ 44} During her testimony, Givens testified that her sister's boyfriend was the person who shot and killed Mike Rispress. Defense counsel objected, and the trial court overruled it. Appellant cites Evid.R. 602 and argues that a witness is not permitted to testify on a matter as to which the witness does not possess personal knowledge. Appellant argued that the statement was hearsay and that the state did not offer an exception.
 {¶ 45} A witness is precluded from testifying on hearsay grounds as to statements made by another only when the statement is being offered to prove the truth of the matter asserted in the statement. See State v.Carter (1995), 72 Ohio St.3d 545. In the present case, there was no out-of-court declarant, and the state argued that the matter was not being offered to prove the truth, that Givens' sister's boyfriend killed Rispress, but to explain why Givens was upset and concerned for her safety before the shooting. Nothing in Givens' testimony linked appellant with the shooting death of Rispress, nor did Givens indicate that she was personally afraid of appellant. Instead, she testified that she had known him for some time, and she spoke to him that evening immediately before the shooting. This court finds that, not only was the statement not hearsay, but that the trial court did not abuse its discretion in permitting the statement in evidence.
 {¶ 46} Next, appellant contends that the trial court improperly excluded extrinsic evidence of bias. Specifically, defense witness, William Vance, testified that he spoke with Kali sometime after the first trial and asked him why he had put appellant in such a position. The prosecutor objected on the basis that, during his testimony, Kali had never been examined, either on direct or cross, regarding any conversations of this sort with Vance. The trial court sustained the objection.
 {¶ 47} Later, defense counsel asked the court to reconsider its ruling, arguing that counsel was not offering the statement as a prior inconsistent statement but was offering it as evidence as bias. Vance was recalled outside the jury's presence for a proffer and testified concerning a conversation which he allegedly had with appellant after the first trial and after Kali accepted a plea agreement in exchange for his testimony against appellant. Vance testified, as follows, with regard to the conversation:
I just pretty much asked him what was going on between him and Cory, and he just got in a little rage.
He said, Fuck Cory, fuck Meca.
I don't know how much time he was actually staring at me. He said he wasn't going to do all of that time. I left him alone, okay. It looked like to me he needed some time by himself, so I left him alone.
(Tr. Vol. III, at 224.)
 {¶ 48} At trial, defense counsel advanced several arguments in an effort to have Vance's testimony included. First, counsel argued that it was permissible under Evid.R. 801 as a non-hearsay statement. However, the trial court properly ruled that the statement was not admissible because of the requirement that the declarant must first be asked about the statement. Next, counsel argued that the testimony was admissible under Evid.R. 608. However, Evid.R. 608 pertains to character evidence which must be in the form of an opinion or a reputation and must go to the issue of truthfulness or untruthfulness. Specific conduct cannot be proved by extrinsic evidence; however, it may be permitted by the trial court on cross-examination. The trial court rejected this theory as well, and this court finds that that was proper. Next, defense counsel argued that the statement was admissible under Evid.R. 404(B) as evidence of other acts. Under Evid.R. 404(B), evidence of other acts is not admissible to prove character and to show that a person acted in conformity; however, it may be admissible as proof of motive. However, the rule provides that the evidence may be admissible. As such, the court has discretion to allow the evidence. In the present case, Vance's proffered testimony does not necessarily show proof of any motive. In fact, as Vance testified on cross-examination, he did not know what Kali meant by this statement because he had not asked Kali a question. As such, it arguably could have demonstrated some motive; however, this court cannot find that it constitutes an abuse of discretion for the trial court to have kept this statement out. Next, defense counsel argued that the statement was admissible under Evid.R. 803(3) as a hearsay exception. However, as the court found, the statement did not prove the declarant's then-existing state of mind or motive. Lastly, while citing to Evid.R. 404(B), defense counsel made the following two statements:
* * * [W]e were not offering it as a prior inconsistent statement. We are offering it as evidence of bias and motive. * * *
* * *
[DEFENSE CO-COUNSEL]: What we are trying to establish is this was an act that shows his motive to take this deal and to lie.
(Tr. Vol. III, at 221-222.)
 {¶ 49} While a majority of courts in the United States require that a witness be given an opportunity to deny or explain an utterance indicating bias, Ohio follows the minority rule and does not require that a foundation be laid as a prerequisite for the introduction of extrinsic evidence of witness bias. See State v. Kehn (1977), 50 Ohio St.2d 11. However, does the statement from Vance, which defense counsel wanted to introduce, actually show the bias which appellant alleges? Appellant argues that the statement shows that Kali was prejudiced against appellant and that that prejudice was his motivation for the plea agreement. Appellant argues that the statement shows that Kali hated him and that was why Kali testified against him. However, the statement could just as easily indicate that Kali realized that both he and appellant were guilty and deserved to be punished; however, Kali realized that he had to protect his own interest and realized he could not take a chance on being convicted simply because the jury did not know who actually pulled the trigger. As Vance himself testified, he did not know what Kali meant by the statement, and neither do we. To the extent that the statement does actually show bias in the manner in which appellant indicates that it does, Vance's testimony would have been an appropriate way to have introduced that evidence. However, if the state were to request that Kali be recalled to the stand to explain the alleged statement, the trial court would have clearly been within its discretion to have permitted the state to have done so. As stated in the assignment of error dealing with manifest weight of the evidence, this court noted that the testimony of Givens alone was sufficient to have convicted appellant in the instant case. As such, any error occasioned by the trial court's refusal to permit this testimony is found to have been harmless, as it would not have affected the outcome of the case.
 {¶ 50} Appellant also argues that the state improperly used the agreement Kali entered into with the prosecutor by stating, during closing arguments, that the fact that Kali would face 19 years in jail was strong incentive for him to tell the truth. Essentially, appellant contends that prosecutorial misconduct affected the outcome of this case.
 {¶ 51} First, this court notes that defense counsel failed to object to the prosecutor's statements. As such, the error is waived except for plain error that would affect the outcome of appellant's trial. State v.Long (1978), 53 Ohio St.2d 91. The test for prosecutorial misconduct is whether remarks were improper and, if so, whether those remarks prejudicially affected substantial rights of the accused. State v. Smith
(1984), 14 Ohio St.3d 13. The touchstone of the analysis is the fairness of the trial and not the culpability of the prosecutor. Smith v.Phillips (1982), 455 U.S. 209, 102 S.Ct. 940.
 {¶ 52} Appellant argues that, pursuant to State v. Cornwell (1999),86 Ohio St.3d 560, the prosecutor is only permitted to briefly examine a cooperating witness about a truthful testimony clause in a plea agreement. In Cornwell, the prosecutor had asked leading questions and bolstered the testimony of three state witnesses by asking questions about their plea bargain agreements with the state. The prosecutor asked each whether the plea agreement was made in exchange for the witness's truthful testimony. The court noted that truthful testimony clauses and plea agreements can be a "two edge sword" because, "[d]efense counsel can effectively argue to the jury that such a clause gives the witness incentive not to tell the truth but to please the prosecutor," while "[p]rosecutors ordinarily elicit information on plea agreements with witnesses during direct examination or to blunt or foreclose unfavorable cross-examination revealing that they agreed to testify in exchange for favorable treatment by the prosecutor." Id. at 571. The court inCornwell did not view the questions as improper in part because the questions were brief, not overly emphasized, and were made at the close of the prosecutor's examination of each witness.
 {¶ 53} In the present case, the prosecutor did question Kali with regard to his plea agreement and with regard to the truthful testimony clause. This court finds that those questions posed to Kali were brief and not overly emphasized and that those comments were not improper. The question then becomes whether or not the prosecutor's statements, during closing argument, wherein the prosecutor repeated the fact of the truthful testimony clause to the jury, were improper.
 {¶ 54} Counsel is afforded a certain amount of latitude during closing arguments. In the present case, this court finds that the prosecutor did not overstep the bounds of proper conduct. Furthermore, even if the brief statements made during closing arguments were improper, this court finds that that error did not rise to the level of plain error affecting the outcome of the trial.
 {¶ 55} Lastly, under this assignment of error, appellant contends that the cumulative effect of these errors he asserts deprived him of a fair trial. Appellant alleged four different errors. This court found that three of appellant's assertions lacked merit and that any error raised by the fourth assertion was harmless. As such, there is no cumulative error to consider. As such, appellant's fourth assignment of error is overruled.
 {¶ 56} In his fifth assignment of error, appellant argues that the trial court did not make the requisite findings required when it sentenced him to more than the minimum sentence under R.C. 2929.14(A) and (B). For the reasons that follow, this court disagrees.
 {¶ 57} R.C. 2929.14 provides, in pertinent part, as follows;
(A) * * * if the court imposing a sentence upon an offender for a felony elects or is required to impose a prison term on the offender pursuant to this chapter * * * the court shall impose a definite prison term that shall be one of the following:
(1) For a felony of the first degree, the prison term shall be three, four, five, six, seven, eight, nine, or ten years.
* * *
(B) * * * if the court imposing a sentence upon an offender for a felony elects or is required to impose a prison term on the offender, the court shall impose the shortest prison term authorized for the offense pursuant to division (A) of this section, unless one or more of the following applies:
(1) The offender was serving a prison term at the time of the offense, or the offender previously had served a prison term.
(2) The court finds on the record that the shortest prison term will demean the seriousness of the offender's conduct or will not adequately protect the public from future crime by the offender or others.
 {¶ 58} By enacting S.B. 2, the Ohio General Assembly significantly altered its approach to criminal sentencing. S.B. 2 provides three distinct areas of judicial limitations when it set about its task of providing truth in sentencing. Those include: (1) sentences imposed beyond the minimum, (2) sentences imposing the maximum, and (3) consecutive sentences. The objective was to provide a degree of consistency and predictability in sentencing. The law set forth findings which are required before a judge would be permitted to depart from the minimum or imposed consecutive sentences. State v. Brooks, 103 Ohio St.3d 134,2004-Ohio-4746. In State v. Edmonson (1999), 86 Ohio St.3d 324, the Supreme Court of Ohio held that a trial court must first make its finding and give its reasons on the record for the imposition of a maximum sentence. Following that pronouncement, the Supreme Court of Ohio, inState v. Comer, 99 Ohio St.3d 463, 2003-Ohio-4165, required that sentencing courts make their findings and give reasons supporting those findings on the record at the sentencing hearing. In applying S.B. 2, trial courts have the duty to make specific findings to support their sentences whenever they go beyond the minimum or when they impose maximum sentences or consecutive sentences. As such, the question raised by appellant's assignment of error is whether or not the trial court, in this particular instance, made the requisite findings and complied with the above-cited law.
 {¶ 59} Pursuant to R.C. 2929.14(A), the prison term for the conviction on a first-degree felony shall be three, four, five, six, seven, eight, nine, or ten years. In the present case, the trial court sentenced appellant to a six-year term of imprisonment. The record shows that, prior to imposing this six-year term, the trial court noted, as follows:
THE COURT: * * * With respect to the Felony One, the court imposes six years in the Ohio Department of Corrections. And the reason for not giving the minimum sentence is because I thought that this victim was totally innocent as it related to this circumstance. She was in fear of her life. She is permanently disfigured. She carries a bullet in her head for the rest of her life. And it was totally and completely senseless.
I believe that it may not have been the worst form of this particular attempted murder, but it comes very close, because the victim is now going to carry this for the rest of her life. She is very lucky that she isn't dead.
(Tr. Vol. VI, at 8-9.)
 {¶ 60} It is undisputed that appellant had not been serving a prison term at the time of the offense, nor had he previously served a prison term. As such, the issue is whether the trial court's statements sufficed to demonstrate a finding that the trial court concluded that the shortest prison term would demean the seriousness of appellant's conduct or would not adequately protect the public from future crime. In this particular case, the court noted the seriousness of appellant's conduct when the court indicated that this "may not have been the worst form of this particular attempted murder, but it comes very close." Id. The trial court then went on to note that the victim will carry this burden for the rest of her life. As the facts of this case indicate, the victim has a bullet lodged in her head and has permanently lost the use of one eye. Although the trial court did not use any magic words, such are not necessary. In this case, this court finds that the trial court found that a three-year term would demean the seriousness of appellant's conduct in shooting the victim in the head and rendering her permanently blind in one eye.
 {¶ 61} Appellant also contends that his sentence was an enhanced sentence; however, it is not. A sentence within the statutory range is not considered to be an enhanced sentence. See State v. Bell, Hamilton App. No. C-030726, 2004-Ohio-3621. As such, the cases that appellant cites regarding enhanced sentences are inapplicable. Appellant's fifth assignment of error is not well-taken and is overruled.
 {¶ 62} In his sixth assignment of error, appellant contends that he was denied his right to effective assistance of counsel. Appellant points to the fact that counsel failed to object to certain errors which were the subject of his third, fourth, and fifth assignments of error and to call witnesses who had given testimony favorable to the defense at the second trial. In Strickland v. Washington (1984), 466 U.S. 668,104 S.Ct. 2052, the United States Supreme Court established a two-prong analysis for determining whether counsel's assistance was so defective as to require a reversal of conviction:
* * * First the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.
Id. at 687.
 {¶ 63} The benchmark for judging any claim of ineffectiveness is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. The proper standard of attorney performance is that of reasonably effective assistance. When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness and that the deficient performance prejudiced the defense. The defendant carries the burden of showing that counsel's deficient performance prejudiced his trial. Id. at 687-691. The burden is met where the reviewing court finds, given the totality of the evidence, that, but for counsel's errors, the jury's verdict would reasonably have been different. Id. at 691-696.
 {¶ 64} First, appellant brings to the court's attention counsel's errors relative to the third, fourth, and fifth assignments of error. The third assignment of error involved appellant's assertion that the jury received an incomplete set of written instructions involving the jury's question regarding credibility and the trial court's response. This court finds no error relative to that assignment of error at all. As such, it cannot be considered under ineffective assistance of counsel argument. With regard to his fourth assignment of error, this court found that Givens' testimony would have been admissible and that no error occurred in that regard. With regard to the evidence counsel attempted to introduce relative to bias, appellant did not allege that counsel did not zealously attempt to have the testimony of Vance admitted. As such, there is no evidence of ineffective assistance of counsel in that regard either. Lastly, relative to the prosecutor's closing arguments concerning the agreement reached between Kali and the prosecution, this court found that the prosecutor's original questions were not improper but that, arguably, it was improper to make the comment during closing argument. Counsel did not object to those comments; therefore, this could be considered under the sixth assignment of error. Further, relative to appellant's fifth assignment of error, this court found that there was no sentencing error. Therefore, to the extent that appellant argues that the errors which were subject matter of the third, fourth, and fifth assignments of error, the only error which could arguably be recognized by this court in the ineffective assistance of counsel claim would be defense counsel's failure to object when the prosecutor mentioned the agreement between Kali and the prosecutor's office during closing argument. Standing alone, an objection to that comment would not have resulted in an outcome which would have been different and did not constitute ineffective assistance of counsel.
 {¶ 65} The only other error which appellant mentions relative to this assignment of error involves the failure to call Dontay Daniels, who testified during the second hearing, to testify at the third hearing. Appellant contends that Daniels' testimony from the second trial reveals that he disputed a number of Kali's claims about what he and Kali had discussed and had done that day.
 {¶ 66} After reviewing the transcript from the second trial and the third trial, this court is unable to substantiate appellant's arguments, and counsel has produced nothing, except for page numbers relative to Daniels' testimony at the second trial, to elucidate this claim. Instead, after reviewing the transcripts, this court finds that both Daniels and Kali indicated that Daniels had told Kali that Daniels believed he knew who had killed Mike Rispress. Daniels got into Kali's car, and the two of them ultimately talked about the murder. Both testified that appellant was in a car behind Kali. The only discrepancy in their testimony is that Daniels testified during the second trial that he, Kali, and appellant never drove their cars down Franklin Avenue, the street on which Givens lived. In the third trial, Kali testified that he and Daniels, with appellant following them, drove down Franklin Avenue, and Daniels pointed out Givens' apartment. In the second trial, however, Daniels did testify that he and Kali were talking about looking for the people responsible for the death of Mike Rispress.
 {¶ 67} Appellant contends that, had Daniels been called as a witness in the third trial, he would have been acquitted and that the cumulative error of counsel's failure to object to the prosecutor's statements concerning the cooperation agreement and the failure to call Daniels as a witness constitutes ineffective assistance of counsel, that he was prejudiced thereby, and that the result of his trial would have been different but for these deficiencies. This court disagrees.
 {¶ 68} First, whatever error there was in not objecting to the prosecutor's potentially improper statements during closing arguments, the error was harmless, and this court cannot see any effect that it had on the trial. Second, with regard to the failure to call Daniels as a witness, this court finds that, but for that failure, the outcome of the trial would not have been different. Whether or not Daniels testified that he and Kali and appellant drove down Franklin Avenue or not, Daniels did testify, as did Kali, that they were discussing finding the people who were responsible for the death of Mike Rispress. Kali and Givens both testified that the boyfriend of Givens' sister was the person responsible for shooting Mike Rispress. As such, with or without Daniels' statement that they did not drive down Franklin Avenue, they would have been looking for the person who shot Mike Rispress, which would have included talking about and identifying where that person might be found. This is not such a significant diversion of testimony that this court can say that, but for counsel's error, the outcome of the trial would have been different. As such, appellant's sixth assignment of error is not well-taken and is overruled.
 {¶ 69} Based on the foregoing, appellant's second, third, fourth, fifth, and sixth assignments of error are overruled in their entirety. Appellant's first assignment of error is overruled in part and sustained in part. This court found that double jeopardy barred the trial court from finding, in the third trial, that appellant was guilty of carrying a weapon while under disability. However, there is no need to remand this matter, as appellant's sentence would not change. Appellant was sentenced relative to count two, attempted murder, to a six-year determinative sentence. The trial court sentenced appellant with regard to count three, having a weapon while under disability, to an eleven-month determinative sentence to be served concurrent with the six-year sentence in count two. As such, the only requirement is that the matter be remanded for a revised judgment entry omitting the finding of guilt relative to having a weapon while under disability, yet with the sentence remaining the same. In all other respects, the judgment of the Franklin County Court of Common Pleas is hereby affirmed.
Judgment affirmed and remanded with instructions.
LAZARUS and FRENCH, JJ., concur.